ACCEPTED
04-15-00633-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
12/14/2015 5:36:21 PM
KEITH HOTTLE
CLERK

*Oral Argument Requested*

# No. 04-15-00633-CV

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
12/14/2015 5:36:21 PM
KEITH E. HOTTLE
Clerk

# In the Fourth Court of Appeals
# San Antonio, Texas

LSREF2 COBALT (TX), LLC, a Foreign Limited Liability Company,
Appellant

v.

410 CENTRE LLC, a Foreign Limited Liability Company,
and JOHN B. URBAHNS, an Individual
Appellees

*On Appeal from the 408th District Court
Bexar County, Texas; Cause No. 2013-CI-20922*

## APPELLANT'S BRIEF

Catherine M. Stone
cstone@langleybanack.com
 Texas Bar No. 19286000
LANGLEY & BANACK, INC.
745 E. Mulberry Avenue, Suite 900
San Antonio, Texas  78212
(210) 736-6600; (210) 735-6889 Fax

Cliff A. Wade
 Texas Bar No. 24013699
CLIFF WADE LAW
3131 McKinney Avenue, Suite 600
Dallas, Texas  75204
(214) 800-2090

Mike Hatchell
 Texas Bar No. 09219000
LOCKE LORD LLP
600 Congress Avenue, Suite 2200
Austin, Texas  78701-2748
(512) 305-4700

David L. Swanson
 Texas Bar No. 019554625
Thomas F. Loose
 Texas Bar No. 12561500
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-6776
(214) 740-8000; (214) 740-8800 Fax

# IDENTITY OF PARTIES AND COUNSEL

APPELLANT:

LSREF2 Cobalt (TX), LLC, a Foreign Limited Liability Company

APPELLANT'S COUNSEL:

Catherine M. Stone
cstone@langleybanack.com
  Texas Bar No. 19286000
LANGLEY & BANACK, INC.
745 E. Mulberry Avenue, Suite 900
San Antonio, Texas  78212
(210) 736-6600; (210) 735-6889 Fax

Mike Hatchell
mhatchell@lockelord.com
  Texas Bar No. 09219000
LOCKE LORD LLP
600 Congress Avenue, Suite 2200
Austin, Texas  78701-2748
(512) 305-4700

David L. Swanson
dswanson@lockelord.com
   Texas Bar No. 019554625
Thomas F. Loose
tloose@lockelord.com
  Texas Bar No. 12561500
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-6776
(214) 740-8000; (214) 740-8800 Fax

Cliff A. Wade
cliff@cliffwadelaw.com
  Texas Bar No. 24013699
CLIFF WADE LAW
3131 McKinney Avenue, Suite 600
Dallas, Texas  75204
(214) 800-2090

i

| APPELLEES: | APPELLEES' COUNSEL: |
|---|---|
| 410 Centre, LLC, a Foreign Limited Liability Company and John B. Urbahns | Peter M. Kelly<br>pkelly@texasappeals.com<br>State Bar No. 00791011<br>Kelly, Durham & Pittard, L.L.P.<br>1005 Heights Boulevard<br>Houston, Texas 77008<br>Telephone: 713.529.0048<br>Facsimile: 713.529.2498<br><br>Randall A. Pulman<br>rpulman@pulmanlaw.com<br>Thomas Rice<br>trice@pulmanlaw.com<br>PULMAN, CAPPUCCIO, PULLEN, BENSON & JONES LLP<br>2161 NW Military Highway, Suite 400<br>San Antonio, Texas 78213<br>(210) 222-9404; (210) 892-1610 Fax |

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL .............................................................i

TABLE OF CONTENTS ............................................................................ iii

STATEMENT OF THE CASE ......................................................................1

ISSUES PRESENTED ...............................................................................3

STATEMENT OF FACTS ...........................................................................4

    A.   410 Centre Borrows $5,100,000 and Urbahns Guarantees Payment and Performance of the Loan .................................................................4

    B.   410 Centre and Urbhans Agree to Pay All Monies Owing Without Offset from Valuation and Appraisement Laws ..................................5

    C.   The Maturity Date on the Loan is Extended Twice. .......................6

    D.   The Parties Enter Into a Pre-Negotiation Agreement to Facilitate Settlement Discussions When 410 Centre Defaults Again. ...........8

    E.   Cobalt Purchases the Property With a Credit Bid at a Properly Conducted Foreclosure Sale. .....................................................9

    F.   A Deficiency Remains Due and Owing Under the Note and Guaranty. ..........9

    G.   The Trial Court Renders a Take-Nothing Judgment. ..................10

SUMMARY OF THE ARGUMENT ...........................................................10

ARGUMENT AND AUTHORITIES ............................................................13

    A.   The PNA Did Not Alter the Parties' Rights Under the Loan Documents. ...............................................................................13

         1.   Offset rights under § 51.003 can be waived and unequivocally were waived by the Loan Documents. ..................................15

         2.   When construed as a whole in light of the circumstances surrounding its execution, as it must be, the PNA has no legal effect on the § 51.003 waiver ..............................................17

(a) Defendants' cabined view renders other portions of the PNA meaningless. ...................................................................18

(b) The circumstances surrounding the execution of the PNA also disprove Defendants' construction. ........................................20

(c) Defendants' construction of Paragraph 3's language is wrong....................................................................................22

3. Cobalt did not have to plead the written waiver of § 51.003, but it did so. ..........................................................................23

(a) Because Cobalt's pleadings sought judgment on the note and guaranty, which both contained the waiver, no further pleading was required. ...................................................23

(b) Cobalt pleaded waiver...............................................................24

B. Cobalt Conclusively Proved All Elements of its Claims to Recover the Deficiency Plus Attorneys' Fees. ....................................................26

1. The existence and validity of the Loan Documents is not in question. ...............................................................................27

2. Cobalt proved it owned the note and guaranty. ....................................27

3. Prerequisites to foreclosure were all satisfied, and the amount of the deficiency was a simple mathematical calculation that was proved conclusively. ............................................................30

4. Cobalt conclusively proved its claim for attorneys' fees. ....................32

CONCLUSION AND PRAYER ........................................................................33

CERTIFICATE OF COMPLIANCE.................................................................36

CERTIFICATE OF SERVICE .........................................................................37

APPENDIX                                                                                 Tab

Trial Court's Judgment (CR:2035) ...........................................................A

Note (6RR:PX2)............................................................................................B

Guaranty (6RR:PX4)............................................................................................C

Forbearance Agreement (6RR:PX7)...................................................................D

Pre-Negotiation Agreement (6RR:PX31)............................................................E

# INDEX OF AUTHORITIES

**Page(s)**

**CASES**

*City of Celina v. Blair*,
171 S.W.3d 608 (Tex. App.—Dallas 2005, no pet.) ...........................................25

*Compass Bank v. Goodman*,
416 S.W.3d 715 (Tex. App.—Dallas 2013, pet. denied)...................................15

*Compass Bank v. Manchester Platinum Mgmt., Inc.*,
No. 05-11-00912-CV, 2013 WL 4081420 (Tex. App.—Dallas Aug. 13,
2013, pet. denied)................................................................................................15

*Dreiling v. Security State Bank & Trust*,
No. 01-14-00257-CV, 2015 WL 1020212 (Tex. App.—Houston [1st
Dist.] March 5, 2015, no pet.)............................................................................15

*Fountains Int'l Group, Inc. v. Summit Oak Dev., LLC*,
No. 04-14-00205-CV, 2015 WL 1138418 (Tex. App.—San Antonio Mar.
11, 2015, no pet.) ...............................................................................................25

*Frost Nat'l Bank v. L & F Dist., Ltd.*,
165 S.W.3d 310 (Tex. 2005) ..............................................................................21

*Holmes v. Graham Mortgage Corp.*,
449 S.W.3d 257 (Tex. App.—Dallas 2014, pet. denied)...................................15

*Hometown 2006-1 1925 Valley View, L.L.C. v. Prime Income Asset Mgmt.,
L.L.C.*, 595 Fed. Appx. 306 (5th Cir. 2014) ......................................................16

*Horizon CMS Healthcare Corp. v. Auld*,
34 S.W.3d 887 (Tex. 2000)................................................................................23

*Houston Cmty. Coll. Sys. v. Schneider*,
67 S.W.3d 241 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) .................25

*Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*,
352 S.W.3d 462 (Tex. 2011) ..............................................................................20

*Hudspeth v. Investor Collection Serv. Ltd. P'ship*,
985 S.W.2d 477 (Tex. App.—San Antonio 1998, no pet.) ................................27

*Lane v. Travelers Indem. Co.*,
    391 S.W.2d 399 (Tex. 1965) ...............................................................21

*LaSalle Bank Nat'l Ass'n v. Sleutel*,
    289 F.3d 837 (5th Cir. 2002) ............................................................15

*Lee v. Martin Marietta Materials Sw., Ltd.*,
    141 S.W.3d 719 (Tex. App.—San Antonio 2004, no pet.) ...............27

*Lopez-Welch v. State Farm Lloyds*,
    No. 3:14-CV-2416-L, 2014 WL 5502277 (N.D. Tex. Oct. 31, 2014) ..............25

*Moayedi v. Interstate 35/Chisam Road, L.P.*,
    438 S.W.3d 1 (Tex. 2014)..............................................................13, 15, 17

*Morgan v. Ebby Halliday Real Estate, Inc.*,
    873 S.W.2d 385 (Tex. App.—Fort Worth 1993, no writ) .................33

*Nussbaum v. City Nat'l Bank*,
    No. 14-13-01052-CV, 2015 WL 545603 (Tex. App.—Houston [14th Dist.] Feb. 10, 2015, pet. denied) .....................................................15

*Paciwest, Inc. v. Warner Alan Props., LLC*,
    No. 02-10-00378-CV, 2012 WL 3499603 (Tex. App.—Fort Worth Aug. 16, 2012, pet. denied)..............................................................33

*Reilly v. Rangers Mgmt., Inc.*,
    727 S.W.2d 527 (Tex. 1987) .............................................................21

*Seagull Energy E & P, Inc. v. Eland Energy, Inc.*,
    207 S.W.3d 342 (Tex.2006)..............................................................18

*Sun Oil (Del.) v. Madeley,*
    626 S.W.2d 726 (Tex. 1981) .............................................................20

*Tawes v. Barnes*,
    340 S.W.3d 419 (Tex. 2011) .............................................................13

## CONSTITUTION, STATUTES, AND RULES

Tex. Prop. Code § 51.003 ..............................................................*passim*

Tex. Prop. Code § 51.003(c)..........................................................13, 15

Tex. R. App. P. 44.1(b) ....................................................................34

TEX. R. CIV. P. 59 ....................................................................24, 25

Tex. R. Civ. P. 296 .......................................................................2

Tex. R. Civ. P. 297 .......................................................................2

## STATEMENT OF THE CASE

This suit to collect a deficiency owing on a note after default and foreclosure by the note holder raises, among others, these important questions:

- When a note and guaranty contain unequivocal waivers of the statutory right to a "fair market value" offset against a deficiency claim, are those waivers negated by a pre-negotiation agreement (PNA) that expressly provides nothing contained in it relieves the borrower or guarantor of any obligation they have under the note and guaranty?

- In construing the effect of the PNA, does a court have to give effect to and harmonize all provisions of the agreement, rather than considering one provision in isolation?

- When a lender sues on and attaches to its petition loan documents that contain a waiver of the statutory right to offset a deficiency by the fair market value of the collateral at the time of foreclosure, does the lender have to separately plead that it is relying on the waiver contained in the loan documents?

Those issues arise in this context:

*The suit:* LSREF2 Cobalt (TX), LLC sued to recover a deficiency owed under a note made by 410 Centre LLC, guaranteed by John B. Urbahns and secured by, among other things, real property.  (CR:141.)  In the note and guaranty, 410 Centre and Urbahns (hereafter "Defendants") agreed to pay all amounts owed

1

without offset, including a claimed fair market value offset under Property Code § 51.003. (PX2, 4.) The principal dispute at trial was whether Cobalt had waived the right to be paid all amounts owed without offset when it executed a Pre-Negotiation Agreement less than a week before a scheduled foreclosure sale in order to have "settlement discussions" with the borrower. (*See* 2RR:124 (Defendants' counsel described this as "the whole issue"); 3RR:10-12.)

*The trial:* Trial was to the court, the Hon. Michael E. Mery presiding. (*See* 2RR:1.) The court initially concluded that any right to an offset "was waived at the outset by the loan documents." (3RR:11-12.) But, after Defendants rested, it reversed course and held that Cobalt "waived the waiver" by entering into the Pre-Negotiation Agreement. (3RR:85-86.) At a hearing where the parties were to make closing arguments, the court announced that both sides would take nothing and that each side shall pay their own attorneys' fees. (4RR:3.)

*The trial court disposition:* The trial court later rendered a take-nothing judgment against Cobalt. (CR:2035.) Cobalt timely requested findings of fact and conclusions of law in accordance with Rule 296 (CR:2037) and timely reminded the court of the request when the findings were past due under Rule 297. (CR:2180.) The trial court never filed findings of fact or conclusions of law.

This appeal was taken timely from that judgment. (CR:2193.)

## ISSUES PRESENTED

1.     Did the trial court err in granting a take-nothing judgment against Cobalt, and in failing to render judgment for Cobalt, on its claims? In particular:

    a.    Did the trial court err as a matter of law by not entering judgment for Cobalt on its deficiency claim and for attorneys' fees where Cobalt proved those claims as a matter of law?

    b.    Did the trial court err as a matter of law in concluding that 410 Centre and Urbahns were not obligated to pay all amounts due and owing under the note and guaranty?

    c.    Did the trial court err as a matter of law in concluding that 410 Centre and Urbahns were entitled to an offset against amounts owed under the note and guaranty, including a fair market value offset under Property Code § 51.003?

    d.    Did the trial court err as a matter of law in concluding that the parties' Pre-Negotiation Agreement altered the parties' agreement that any claim for an offset under § 51.003 was waived?

    e.    To the extent the trial court concluded Cobalt was required, but failed, to plead waiver, did the court err as a matter of law?

2.     In the event this Court determines there were fact issues on any element of Cobalt's burden of proof – including the existence of the note, the

3

validity of the signatures, Cobalt's ownership, the default, or the amount of the deficiency – are any presumed findings on those elements against the great weight and overwhelming preponderance of the evidence, requiring that the judgment be reversed and the cause remanded to the trial court for retrial of those elements?

3. In the event the Court determines it cannot compute and render judgment on the deficiency, must the case be remanded to the trial court either for calculation of the deficiency amount or a trial only on those facts necessary to determine that amount?

## STATEMENT OF FACTS

**A. 410 Centre Borrows $5,100,000 and Urbahns Guarantees Payment and Performance of the Loan.**

In 2008, 410 Centre, LLC, entered into a Loan Agreement with M&I Marshall & Ilsley Bank and executed and delivered a promissory note in the original principal amount of $5,100,000.00. (PX1, 2.) 410 Centre also executed a Deed of Trust Security Agreement to secure repayment of the note and place a lien on the property. (PX3.)

"As partial consideration for and in order to induce Lender to make the Loan," John B. Urbahns, a sophisticated businessman and member of 410 Centre, executed a Continuing Guaranty in which he "absolutely, unconditionally and irrevocably" guaranteed payment and performance by 410 Centre. (PX4 (¶¶ C, 1); 3RR:48, 84.)

4

Cobalt became the owner and holder of the note and beneficiary of the guaranty.[1]   (PX2 (allonges affixed to note); PX8-15 (assignments of Loan Documents); 2RR:63-65, 68-70; 2RR:76 (Cobalt has possession of the original Loan Documents and is the owner and holder of the note and beneficiary of the guaranty).)

**B.      410 Centre and Urbhans Agree to Pay All Monies Owing Without Offset from Valuation and Appraisement Laws.**

In the note, 410 Centre agreed to the following waiver of statutory rights:

6.      <u>Valuation and Appraisement Laws</u>.  All principal, interest and other amounts payable under or with respect to this Note shall be payable without relief from valuation and appraisement laws.

13.      <u>Waiver and Consent</u>. …  All guarantors … of this Note hereby waive generally and specifically, to the extent waivable, any and all rights that they may have, by contract, at equity or under any state or federal law, to any defense, offset, claim in recoupment or counterclaim not specifically set forth herein.

(PX2 (¶¶ 6, 13).)

In the guaranty, Urbahns agreed to similar terms:

2.      Guarantor agrees to pay to Lender, without relief from valuation and appraisement laws, all amounts payable under this Guaranty …

11.      Guarantor hereby waives each of the following:

***

(e)      Any and all rights Guarantor may have under any anti-deficiency statute or other similar protections.

---

[1] Cobalt also was assigned all other "Loan Documents," as defined in paragraph 1.1 of the Loan Agreement.  (PX8-15.)

(PX4 (¶¶ 2, 11).)  Urbahns further agreed that his obligations "under this Guaranty shall be absolute and unconditional under any and all circumstances … and shall remain in full force and effect until … the Indebtedness has been paid in full." (PX4 (¶ 7).)[2]

## C.    The Maturity Date on the Loan is Extended Twice.

410 Centre failed to pay amounts due and owing when the note matured on June 30, 2010.  (*See* 2RR:58-59; PX2 (¶ 1 at p. 3 (defining the "Original Maturity Date")).)  410 Centre and M&I extended the maturity of the loan to September 30, 2011, under a Confirmation and Amendment of Loan Documents (PX5) in which 410 Centre also:

- reaffirmed and ratified "all warranties, representations, provisions, conditions, terms, covenants and agreements set forth in" the note and deed of trust;

- represented and warranted that it had "no defenses, offsets, claims or counterclaims against Lender;" and

- agreed "that Lender has not waived the full compliance by Borrower with all terms and provisions" of the Note and deed of trust.

(PX5 (¶¶ 7, 9, 12).)

Contemporaneously, Urbahns also executed a Consent and Confirmation of Guaranty in which he consented to the extension of the maturity date, and:

---

[2] The term "Indebtedness" is defined in the guaranty as "all of the indebtedness, obligations and Indemnifications guaranteed hereby."  (PX4 at ¶ 1.)

- reaffirmed and ratified "all warranties, representations, provisions, conditions, terms, covenants and agreements set forth in" the guaranty;

- represented and warranted that he had "no defenses, offsets, claims or counterclaims against Lender;" and

- agreed that Lender had not waived full compliance by "Guarantor with all terms and provisions of the Guaranty."

(PX6 (¶¶ 2, 4, 5).)

BMO Harris Bank N.A. became the successor-by-merger to M&I. 410 Centre informed that bank that it was unable to pay the loan on the new maturity date – September 30, 2011. (PX7 (¶ E).) So, Defendants and BMO entered into a Forbearance Agreement. (PX7.) In the Forbearance Agreement, Defendants acknowledged that 410 Centre was "in default under the terms of the Loan Documents and that Lender is entitled to exercise all of its rights, powers and remedies thereunder." (PX7 (¶ 3).) BMO agreed that, during the Forbearance Period (September 30, 2011 to September 30, 2013), it would forbear from initiating or prosecuting any legal action to collect the debt. (PX7 (¶ 5).) In the Forbearance Agreement, Defendants again agreed that:

- they had "no defenses, set-offs, claims, counterclaims, affirmative defenses, or causes of action of any kind or nature with respect to any of the Loan Documents or the Indebtedness represented thereby;"

- "nothing contained herein shall be deemed to be a waiver by Lender of … any provision contained in the Loan Documents;" and

7

- they "forever relinquish and waive, any and all debts, demands, claims, defenses … affirmative defenses and causes of action whatsoever …"

(PX7 (¶¶ 4, 21).)

## D. The Parties Enter Into a Pre-Negotiation Agreement to Facilitate Settlement Discussions When 410 Centre Defaults Again.

410 Centre and Urbahns failed to pay the debt when it matured on September 30, 2013. (2RR:60-61, 63.) Steps were initiated to foreclose on the property. (2RR:76-77; PX21 (notice of foreclosure); PX22 (appointment of substitute trustee); PX23-25 (Affidavits of Preparation, Filing, Posting and Mailing foreclosure notices).)

After receiving notice of the foreclosure sale, Urbahns requested a further delay in enforcement of the Loan Documents and asked to discuss resolution of the past-due debt. (3RR:60, 76-77.) Thus, less than a week before the scheduled foreclosure sale, 410 Centre, Urbahns, and Wells Fargo Bank – the then-holder of the note – entered into a Pre-Negotiation Agreement. (PX31.) This is the critical document that, according to the trial court, waived the waiver of offset rights under Property Code § 51.003.

The PNA recites that the "parties have had meetings, discussions and negotiations and contemplate further meetings, discussions and possible negotiations between themselves or their agents or representatives regarding the Loan, and the facts and circumstances attendant thereto." (PX31 (¶ B).) The PNA

provided: (i) that nothing said during the course of discussions would in any way modify the Loan Documents "except to the extent the parties otherwise agree in a duly executed and binding written agreement pursuant to <u>Section 4</u>" of the PNA (PX31 (¶ 1)); and (ii) that nothing contained in it was intended to limit or affect Cobalt's rights, or to relieve 410 Centre or Urbahns of any obligation, under the Loan Documents. (PX31 (¶ 5).) The parties' discussions did not lead to any written agreement under Section 4 of the PNA.

**E.    Cobalt Purchases the Property With a Credit Bid at a Properly Conducted Foreclosure Sale.**

410 Centre and Urbahns were notified on October 15, 2013, that the foreclosure sale was scheduled for November 5, 2013. (PX21.)[3] The foreclosure sale was properly conducted on the noticed date and time, and the property was sold to Cobalt for a credit bid (a bid by a secured lender of a credit against the debt instead of cash) of $2,800,000.00. (PX26; *see also* 2RR:82-83.)

**F.    A Deficiency Remains Due and Owing Under the Note and Guaranty.**

Cobalt put on a witness who testified, without rebuttal, that, as of the date of foreclosure, the principal balance owed on the note was $5,099,909.00, the regular interest balance was $36,726.43, and the default interest balance was $17,566.35, for a total indebtedness of $5,154,201.78. (2RR:102-03; PX17 (loan history from

---

[3] The notice also provided: "Lender does not intend to waive, and nothing contained herein shall be construed as a waiver of, any of the rights and remedies of Lender under the Loan Documents, or under applicable law." (PX21 at 2.)

9

June 13, 2008 through October 1, 2012); PX18 (loan history from October 1, 2012 through September 1, 2013).)

## G.     The Trial Court Renders a Take-Nothing Judgment.

At the conclusion of the evidence, and prior to a hearing in which the trial court was to hear closing arguments, the court announced that it would render judgment that both parties "take nothing," which it later did.  (4RR:3; CR:2035.) The court stated on the record the basis for the ruling:  "I have made a determination … that any waiver of those rights under Chapter 51 of the Property Code, if any, that occurred were, in fact, waived by the entry of the … pre-negotiation agreement," specifically, "provision number 3."  (3RR:85-86.)

Certainly that was the central legal issue in the case.  But, because of the absence of findings and conclusions, Cobalt will brief all elements of its burden of proof, starting with the issue of the §51.003 waiver and concluding with the mechanical elements of the foreclosure.

## SUMMARY OF THE ARGUMENT

The take-nothing judgment should be reversed and judgment rendered for Cobalt (or remanded for entry of judgment) for the following reasons:

1.      **The § 51.003 Waiver:** This case should have been a straightforward suit for a deficiency under a promissory note.  The trial court rendered judgment only because of Defendants' argument that the parties' agreements in the note and

10

guaranty unequivocally waiving the fair market value offset in § 51.003 were themselves waived by a single paragraph – Paragraph 3 – of the Pre-Negotiation Agreement. That was error for several reasons:

- Isolating paragraph 3 and imputing waiver from its provisions out of the context of the entire agreement violated the rule that all provisions of a contract must be harmonized so that all are given effect.

- When considered along with paragraphs 2, 4, 5 and 6 – as proper contract construction principles require – it is clear that, as a whole, the PNA operates as a standstill agreement wherein the parties preserved the status quo, without waiving existing or matured rights, for the sole purpose of entertaining settlement negotiations. For example, paragraph 5 unequivocally says that the PNA is not intended (i) to "limit or otherwise affect" Cobalt's "rights or remedies it may have before, during or after" the negotiations and, conversely (ii) it is not intended "to relieve the Obligor [Defendants] of any obligations it has under the Loan Documents." Paragraph 2 says that, by executing the PNA, Cobalt is not waiving its right to "insist on full performance" of the loan agreement. And Paragraphs 4 and 6 say (i) that no modification of the loan documents could be accomplished without a separate writing approved by a lender committee and confirmed by senior management (which never occurred) and (ii) Cobalt's

11

negotiators implementing the PNA have no authority to bind Cobalt short of the requirements of paragraph 4.

The trial court's allowing paragraph 3 to render all those provisions meaningless violates fundamental contract construction principles.

● Finally, the trial court's construction is contrary to the surrounding circumstances and common sense. The loan was in default and foreclosure was imminent when the PNA was executed. It makes no sense that Cobalt would give up all the protections in the various waivers of fair market value offset rights just to open uncertain "negotiations" with Defendants which could (and did) lead nowhere.

**2. Elements of a deficiency judgment:** The remaining elements necessary to Cobalt's obtaining a deficiency judgment were either admitted or proved conclusively:

(i) Defendants admitted the making of the loan and the guaranty.

(ii) Cobalt meticulously traced its ownership of the Loan Documents.

(iii) The default on the loan was admitted.

(iv) Cobalt's witness established without challenge the mechanical computation of the deficiency.

(v) The parties stipulated to recoverable attorneys' fees.

Thus, all components essential to a final deficiency judgment were established, permitting this court to render judgment for the deficiency or remand it to the trial court for entry of judgment on the proved sums.

## ARGUMENT AND AUTHORITIES

The fact that the trial court filed no findings of fact or conclusions of law, although timely requested (and reminded) to do so, does not affect the case procedurally, because Cobalt's issues all concern questions of law and are reviewed *de novo*. In particular, the controlling issues involve construction of contracts that are unambiguous and, as this Court knows, "[t]he interpretation of an unambiguous contract . . . is a question of law," which this Court reviews *de novo*. *Moayedi v. Interstate 35/Chisam Road, L.P.*, 438 S.W.3d 1, 7 (Tex. 2014); *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011).

In the following arguments, Cobalt will show (i) the documents conclusively waived 410 Centre's principal statutory defense that it was entitled, under § 51.003 of the Property Code, to have the deficiency wiped out by offsetting against the loan balance the fair market value of the property; and (ii) as a matter of law, Cobalt proved all other prerequisites to a deficiency judgment.

## A. The PNA Did Not Alter the Parties' Rights Under the Loan Documents.

The centerpiece of Defendants' defense to the deficiency claim is Tex. Prop. Code § 51.003(c), which provides:

If the court determines that the fair market value is greater than the sale price of the real property at the foreclosure sale, the persons against whom recovery of the deficiency is sought are entitled to an offset against the deficiency in the amount by which the fair market value, less the amount of any claim, indebtedness, or obligation of any kind that is secured by a lien or encumbrance on the real property that was not extinguished by the foreclosure exceed the sale price.

Defendants' principal argument is that their waiver of § 51.003's offset rights in the Loan Documents was itself waived and negated by the later PNA and, therefore, the deficiency is wiped out by the fair market value of the property. For example, Defendants' counsel stated in his cross examination of Cobalt's representative, Marisa McGaughey: " … the whole issue here in the trial … [i]s whether your company was obligated … to give Mr. Urbahns and 410 Centre a credit for the fair market value of the property as of November 5, 2013." (2RR:124.) That is the only argument the trial court appears to have credited when he stated on the record: "I have made a determination … that any waiver of those rights under Chapter 51 of the Property Code, if any, that occurred were, in fact, waived by the entry of the … pre-negotiation agreement," specifically, "provision number 3." (3RR:85-86.)

That theory succumbs to the unambiguous language of the instruments involved, established principles of contract construction, and common sense:

**1.    Offset rights under § 51.003 can be waived and unequivocally were waived by the Loan Documents.**

*First*, there is no policy or prohibition against waiving the protections of § 51.003. Courts construe the § 51.003 offset right as an affirmative defense that may be waived. *Moayedi*, 438 S.W.3d at 6-7. In that case, the Court held the guarantor had waived the statutory right of offset under § 51.003(c) by agreeing to a general waiver of defenses in a guaranty agreement. *Id.* at 7-8.[4] Following suit, many Texas courts have found similar language sufficient to unequivocally waive offset rights under § 51.003.[5]

---

[4] The waiver here is clearer than that in *Moayedi* because it waives the specific defense 410 Centre and Urbahns purport to assert. *See Moayedi*, 438 S.W.3d at 7 n.31 (noting that a waiver of a "right of offset" was more specific than a general waiver of defenses). In this case, however, 410 Centre and Urbahns agree to pay all amounts owed without relief from – not just general laws – but from valuation and appraisement laws, and Urbahns waived any right he may have had specifically under "any anti-deficiency statute or other similar protections." (PX2, 4.)

[5] *Holmes v. Graham Mortgage Corp.*, 449 S.W.3d 257, 265 (Tex. App.—Dallas 2014, pet. denied) (holding guarantor who waived "any defense to liability" included an offset defense under § 51.003 as a matter of law); *Nussbaum v. City Nat'l Bank*, No. 14-13-01052-CV; 2015 WL 545603, at *3 (Tex. App.—Houston [14th Dist.] Feb. 10, 2015, pet. denied) (holding agreement not to "insist upon, plead, claim, or take the benefit or advantage of any law now or hereafter in force … providing for any appraisement, valuation, stay, extension or redemption …" sufficient to waive offset under § 51.003 as a matter of law); *Dreiling v. Security State Bank & Trust*, No. 01-14-00257-CV, 2015 WL 1020212, at * 4-5 (Tex. App.—Houston [1st Dist.] March 5, 2015, no pet.) (holding guarantor's agreement to make all payments "without set-off or deduction or counterclaim" waived offset under § 51.003 as a matter of law); *Compass Bank v. Manchester Platinum Mgmt., Inc.*, No. 05-11-00912-CV, 2013 WL 4081420, at *3 (Tex. App.—Dallas Aug. 13, 2013, pet. denied) (holding guaranty language stating "Guarantor waives, to the fullest extent permitted by applicable law, the benefit of any statute of limitation or other defenses affecting its liability hereunder or the enforcement thereof" was sufficient to waive right under § 51.003 as a matter of law) (emphasis added); *Compass Bank v. Goodman*, 416 S.W.3d 715, 719 (Tex. App.—Dallas 2013, pet. denied) (same).The Fifth Circuit, construing Texas law, holds similarly. *See also LaSalle Bank Nat'l Ass'n v. Sleutel*, 289 F.3d 837, 839-42 (5th Cir. 2002) (holding guarantor waived § 51.003 rights under agreement providing "Guarantor expressly waives and relinquishes all rights and remedies now or hereafter accorded

*Second*, every document signed by Defendants unambiguously waives rights under § 51.003. For example:

● In the *note*, 410 Centre agreed it had no right to claim a credit or offset based on a fair market value appraisal of the property at the time of foreclosure and, in fact, it agreed to pay "the entire unpaid principal balance and all accrued interest" "without relief from valuation and appraisement laws." (PX2 (¶¶ 3.3, 6).)

● In the *guaranty*, Urbahns agreed to pay "without relief from valuation and appraisement laws, all amounts payable" under the guaranty, and expressly waived "[a]ny and all rights Guarantor may have under any anti-deficiency statute or other similar protections." (PX4 (¶¶ 2, 11(e).) Urbahns further agreed "to waive any anti-deficiency statute or other similar protections which may exist under applicable law," and promised "to pay to Lender upon demand the amount of any such deficiency." (PX4 (¶ 14).)

● In the *Forbearance Agreement*, Defendants re-affirmed agreements in the Loan Documents and acknowledged that they had "no defenses, set-offs, claims, counterclaims, affirmative defenses, or causes of action of any kind or

---

by applicable law to guarantors … including … any defense, right of offset or other claim which Guarantor may have against Lender …"); *Hometown 2006-1 1925 Valley View, L.L.C. v. Prime Income Asset Mgmt., L.L.C.*, 595 Fed. Appx. 306, 309-10 (5th Cir. 2014) (holding guarantor waived offset claim when it agreed its obligations "shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense …").

nature with respect to any of the Loan Documents or the Indebtedness represented thereby." (PX7 (¶ 4).)

Given the unambiguous language in all the Loan Documents, it is clear why Defendants must find some other document to accomplish the waiver essential to their judgment. Their argument that the PNA does so runs aground on contract construction principles as well.

**2. When construed as a whole in light of the circumstances surrounding its execution, as it must be, the PNA has no legal effect on the § 51.003 waiver.**

Defendants' resort to the PNA to absolve the deficiency depends on ignoring all provisions of the PNA except Paragraph 3. That paragraphs provides:

> 3. <u>No Waiver by Obligor</u>. Obligor has not in any way waived any rights or remedies it may have prior to and until the date of this Agreement with respect to the Loan or any of the Loan Documents, or otherwise available at law or in equity either directly in an action against Creditor, as a defense against any action by Creditor against Obligor or any other civil proceeding or otherwise.

(PX31 (¶ 3).)

Defendants' myopic view violates the rule that courts "must 'examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument.'" *Moayedi*, 438

17

S.W.3d at 7 (quoting *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) (emphasis in the original)).

Defendants' theory assaults those principles several ways.

### *(a)   Defendants' cabined view renders other portions of the PNA meaningless.*

**Paragraph 5 of the PNA refutes Defendants' argument.** It provides:

> … *Nothing contained in this Agreement is intended (i) to limit or otherwise affect Creditor's rights* or Creditor's ability to initiate, continue or otherwise proceed to exercise *any rights or remedies it may have before, during or after Discussions,* if any, including, but not limited to, giving notices of default or initiating foreclosure proceedings; *or (ii) to relieve the Obligor of any obligations it has under the Loan Documents*.

(PX31 (¶ 5 (emphasis added).)[6]  A Cobalt representative correctly explained that the PNA "preserves the loan documents in their original state … *they're not being modified.*"  (2RR:129 (emphasis added).)

If paragraph 3 is construed as Defendants claim, *i.e.*, to modify Cobalt's rights and to relieve Defendants of obligations under the Loan Documents, then paragraph 5 is rendered meaningless – in clear violation of the rules of construction.

**Paragraph 2 of the PNA also says Cobalt has not waived any rights or remedies.**  Paragraph 2 explicitly contradicts Defendants' limited view because it

---

[6] "Loan Documents" are defined in the PNA, and include, among other things, the note, the deed of trust, and the guaranty.  (PX31 (at Exhibit A).)

unambiguously protects against and forecloses the very waiver Defendants claim when it says:

> No Waiver by Creditor. Creditor has not in any way waived any rights or remedies it may have to insist on full performance by the Obligor of all obligations under the Loan Documents or any rights or remedies available to it thereunder or otherwise available at law or in equity.

(PX31 (¶ 2).)

It is impossible to reconcile Defendants' interpretation of paragraph 3 – that it negates the Property Code waiver in the Loan Documents – without flouting the plain language of paragraph 2 that Cobalt has not "in any way" waived its right to "insist on full performance … of all obligations under the Loan Documents." (PX31 (¶ 2).) Full performance under the Loan Documents includes payment of all amounts owed "without relief from valuation and appraisement laws." (PX2 (¶ 6); PX4 (¶ 2).) Thus, under Defendants' interpretation, the PNA would nonsensically provide that, under paragraph 2 Cobalt *had not waived* the right to full performance, but under paragraph 3 Cobalt *had waived* the right to full performance. The two paragraphs can rationally be harmonized, as contract construction principles require, by construing Paragraph 3 as part of an agreement that "preserves the loan documents in their original state." (2RR:129.)

**PNA's paragraphs 4 and 6 preclude any modification without specified formalities.** Paragraph 4 precludes *any* modification of the Loan Documents

19

unless agreed to in writing, approved by Cobalt's resolution committee, and confirmed by its senior management. Paragraph 6 provides that the individuals engaged in discussions with Defendants have no authority to bind Cobalt, and it reiterates the continuing effect of paragraph 4 formalities required to modify the Loan Documents.[7]

None of those formalities accompanied execution of the PNA. Thus, the detailed provisions specifying requirements for modification of the Loan Documents are also rendered meaningless if the PNA itself is construed to modify the Loan Documents.

### (b) The circumstances surrounding the execution of the PNA also disprove Defendants' construction.

The PNA's purpose and meaning are further and properly informed by the circumstances surrounding its execution. *See Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011) (citing *Sun Oil (Del.) v. Madeley,* 626 S.W.2d 726, 731 (Tex. 1981)).[8]

---

[7] There was no evidence that any agreement to modify the Loan Documents, or the PNA itself, was approved by Cobalt's resolution committee and confirmed by its senior management.

[8] The parol evidence rule "does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." *Houston Exploration*, 352 S.W.3d at 469. Circumstances that may be considered include "'the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give a context to the transaction between the parties.'" *Id.* (quoting 11 Richard A. Lord, WILLISTON ON CONTRACTS § 32.7 (4th ed. 1999)).

20

The PNA was executed October 30, 2013 – less than a week before a scheduled foreclosure. (PX31.) At that time, 410 Centre was already in default under the note by failing to pay the debt at maturity. (*See* PX21, 23.)[9] There is no evidence that, in executing the PNA, Defendants intended to negotiate an agreement that would potentially relieve them of their deficiency liability or that Cobalt intentionally relinquished its right to seek any deficiency without offset. The purpose of the PNA was "for settlement discussions." (2RR:130.)

It is counterintuitive that Cobalt would have given up such a valuable right on the eve of the scheduled foreclosure sale simply for the opportunity to engage in discussions with Defendants. Given the immediate circumstances, Defendants' construction of the PNA runs afoul of the principle that courts "construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" *Frost Nat'l Bank v. L & F Dist., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)); *see also Lane v. Travelers Indem. Co.*, 391 S.W.2d 399, 402 (Tex. 1965) (refusing to construe contract in manner that would lead to absurd results). Indeed, Defendants' construction of the PNA's

---

[9] In the October 15, 2013 notice of foreclosure, Cobalt again told Defendants it did not intend to waive "any of the rights and remedies of Lender under the Loan Documents …." (PX21.)

paragraph 3 as itself substantially altering the Loan Documents would be utterly without consideration.

### (c) *Defendants' construction of Paragraph 3's language is wrong.*

Even if contract construction principles countenanced looking at paragraph 3 in isolation, that paragraph's language does not mean what Defendants claim:

*First,* the PNA provides that the Loan Documents would not be modified, "except to the extent the parties *otherwise agree* in a duly executed and binding written agreement pursuant to <u>Section 4</u>…." (PX31 (¶ 1) (italics emphasis added).) This requires an agreement *other than the PNA* to modify the Loan Documents.

*Second,* Paragraph 3 says "Obligor has not in any way waived any rights or remedies *it may have* prior to and until the date of this Agreement …" (PX31 (¶ 3) (emphasis added).) By executing the PNA with that language, Defendants did not waive any right or remedy they "may have," but the PNA did not revive rights Defendants did not have. At that time, they did not have a right to an offset under Chapter 51 because they had waived that right in the note and guaranty. Therefore, the parties' agreement that 410 Centre and Urbahns would pay the debt "without relief from valuation and appraisement laws" was unaffected by paragraph 3 of the PNA.

**3. Cobalt did not have to plead the written waiver of § 51.003, but it did so.**

In the trial court, Defendants argued that Cobalt could not rely on the written waivers in the note and guaranty because Cobalt did not plead waiver. (E.g., 2RR:15.) This argument is wrong on the law, but, in fact, Cobalt did plead waiver. Thus, the argument is meritless on several levels:

> *(a)* *Because Cobalt's pleadings sought judgment on the note and guaranty, which both contained the waiver, no further pleading was required.*

Cobalt sued on the note and guaranty to enforce *all* of the rights provided under them. Payment of all amounts owed *without statutory offset* was an integral part of the claim, not something to set up as an affirmative defense in response to Defendants' later denials or defenses. (PX2 (¶ 6); PX4 (¶ 2).) If Defendants truly were uncertain about Cobalt's reliance on the offset waiver – a fact hard to believe since they argued it to the trial court (*e.g.*, 2RR:119-27) – they should have filed a special exception to Cobalt's pleadings. Their failure to do so presumes they understood the full parameters of the claim. *See Horizon CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896-97 (Tex. 2000) (the purpose of the fair notice pleading rule is to give the opposing party information sufficient to enable him to prepare a defense and, in the absence of special exceptions, "courts should construe the pleadings liberally in favor of the pleader").

23

### (b) Cobalt pleaded waiver.

Similarly, because the offset waiver was an integral part of the Loan Documents essential to Cobalt's claim, pleading claims under those documents inherently invoked the waiver.

To its live petition, Cobalt attached copies of relevant Loan Documents and incorporated them by reference. (CR:141 (First Amended Petition); CR:204 (note attached as Exhibit 2); CR:241 (Forbearance Agreement attached as Exhibit 3); CR:249 (guaranty attached as Exhibit 4).) Among other things, Cobalt alleged:

> 10. On or about June 13, 2008, Borrower executed and delivered to M&I Marshall & Ilsley Bank ("M&I") a Loan Agreement ("Loan Agreement") and Promissory Note in the original principal amount of $5,100,000.00, as amended, renewed, modified and extended (the "Note"). *True and correct copies of the Loan Agreement and Note are attached hereto as Exhibit Nos. 1 and 2, respectively, and by reference made a part hereof.*

> 21. On or about June 13, 2008, Urbahns executed and delivered to M&I a Continuing Guaranty, whereby Urbahns unconditionally guaranteed payment of all monies due under the Note (the "Urbahns Guaranty"). *A true and correct copy of the Urbahns Guaranty is attached hereto as Exhibit No. 4 and by reference made a part hereof.*

(CR:143, 145 (emphases added).)

Rule 59 of the *Texas Rules of Civil Procedure* allows a party to attach written instruments constituting the claim sued upon and that the terms of those instruments are deemed a part of the pleading "for all purposes":

> Notes, accounts, bonds, mortgages, records, and all other written instruments, constituting, in whole or in part, the claim sued on, or the matter set up in defense, *may be made a part of the pleadings by*

24

*copies thereof, or the originals, being attached or filed and referred to as such*, or by copying the same in the body of the pleading in aid and explanation of the allegations in the petition or answer made in reference to said instruments and shall be deemed a part thereof for all purposes.  Such pleadings shall not be deemed defective because of the lack of any allegations which can be supplied from said exhibit.  No other instrument of writing shall be made an exhibit in the pleading.

TEX. R. CIV. P. 59 (emphasis added).

This court interprets Rule 59 broadly:

Rule 59 provides the procedure whereby notes attached to pleadings can supply additional allegations the pleadings do not expressly contain.  When a note is attached to a pleading, Rule 59 permits the allegations in the note to supplement the allegations in the pleadings for purposes of determining whether a party received fair notice of a claim.

*Fountains Int'l Group, Inc. v. Summit Oak Dev., LLC*, No. 04-14-00205-CV, 2015 WL 1138418, at *2 (Tex. App.—San Antonio Mar. 11, 2015, no pet.).[10]

Because the note, Forbearance Agreement, and guaranty were a part of Cobalt's First Amended Petition, Cobalt implicitly pleaded all terms of those instruments, *including* a general waiver of defenses and the specific contractual waiver of any right to an offset based on valuation and appraisement laws.

---

[10] *See also*, e.g., *Lopez-Welch v. State Farm Lloyds*, No. 3:14-CV-2416-L, 2014 WL 5502277, at *7 (N.D. Tex. Oct. 31, 2014) (construing Tex. R. Civ. P. 59, court concluded a report "attached to and referenced in the Petition … is considered part of the pleadings."); *City of Celina v. Blair*, 171 S.W.3d 608, 612 n.5 (Tex. App.—Dallas 2005, no pet.) ("Documents constituting all or part of the claim sued on may be made a part of the pleadings by being attached and referred to in the pleading" and, so attached, "shall be deemed a part of the pleading for all purposes"); *Houston Cmty. Coll. Sys. v. Schneider*, 67 S.W.3d 241, 243 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) ("a pleading shall not be deemed defective because of the lack of any allegation that can be supplied from attached exhibits").

However one looks at the issue, Cobalt's reliance on the written waivers of the § 51.003 offset have been in the case via the pleadings from the beginning. There was no requirement for further pleading.

*To sum up* …,

The judgment cannot be supported on the theory that the PNA retroactively waived and nullified the consistent plethora of waivers of § 51.003's rights throughout all the Loan Documents. The principles of contract construction, the unambiguous language of all the documents, the surrounding circumstances, and common sense all auger against and disprove conclusively that the PNA can be given such effect.

## B. Cobalt Conclusively Proved All Elements of its Claims to Recover the Deficiency Plus Attorneys' Fees.

Apart from the § 51.003 offset issue, the other elements of Cobalt's claim to collect a deficiency on the loan and guarantee are not seriously in dispute. The following arguments quickly show that all those elements were established conclusively.[11]

---

[11] The record shows the trial court entered the take-nothing judgment by construing the PNA as a waiver of Defendants' agreement to pay all amounts owed without relief from valuation and appraisement laws (3RR:85-86), and Cobalt is entitled to a judgment on its claims because of the error in that ruling. Because the trial court failed to file findings of fact and conclusions of law, it is impossible to know if and how the court ruled on other issues. If this Court finds there were issues of fact on other elements presumed found by the trial court in support of the judgment, Cobalt contends, based on the facts discussed herein, that such findings are against the great weight and overwhelming preponderance of the evidence. Therefore, at a minimum, Cobalt is entitled to reversal of the judgment and remand for a new trial on those issues.

To recover a deficiency on a note, one must establish: (1) the note in question, (2) that defendant signed the note, (3) that the plaintiff was the legal owner and holder of the note, and (4) that a certain balance was due and owing under the note. *Hudspeth v. Investor Collection Serv. Ltd. P'ship*, 985 S.W.2d 477, 479 (Tex. App.—San Antonio 1998, no pet.). Similarly, in a suit for breach of a guaranty agreement one must establish "(1) the existence and ownership of the guaranty contract, (2) the terms of the underlying contract by the holder, (3) the occurrence of the conditions upon which liability is based, and (4) the failure or refusal to perform the promise by the guarantor." *Lee v. Martin Marietta Materials Sw., Ltd.*, 141 S.W.3d 719, 720 (Tex. App.—San Antonio 2004, no pet.).

Cobalt's proof addressed each element and established each conclusively:

### 1. The existence and validity of the Loan Documents is not in question.

The existence of the note and the validity of the signatures on the note and guarantee have been conceded by Defendants. (*E.g.*, 3RR:71-72.)

### 2. Cobalt proved it owned the note and guaranty.

The Loan Documents state that they may be transferred and assigned. For example, the note provides that 410 Centre's obligations "shall inure to the benefit of Lender and Lender's successors, assigns and legal representatives." (PX2 (¶ 20).) Likewise, the deed of trust provides that its terms, provisions and conditions "shall inure to the benefit of Trustee and Lender and their respective

27

successors, substitutes and assigns." (PX3 (¶ 6.15).) Urbahns also agreed that the guaranty "shall inure to the benefit of Lender and its successors, assigns and legal representatives." (PX4 (¶ 26).)

The allonges attached to the note prove that it was transferred from the original lender to Cobalt as follows:

| Date: | Transferor: | Transferee: | Record Cite: |
|---|---|---|---|
| September 25, 2013 | BMO, as successor-by-merger to M&I | LSREF2 Cobalt, LLC | PX2 (p. Cobalt 28) |
| September 25, 2013 | LSREF2 Cobalt, LLC | LSREF2 Cobalt Trust 2013 | PX2 (p. Cobalt 29-30) |
| September 25, 2013 | LSREF2 Cobalt Trust 2013 | Wells Fargo | PX2 (p. Cobalt 31-32) |
| November 1, 2013 | Wells Fargo | Cobalt | PX2 (p. Cobalt 616-17) |

The transferors / transferees listed above also executed assignments that correspond to the allonges affixed to the note. (PX8-15.)

On September 25, 2013, BMO – the successor-by-merger to M&I (the loan originator) – assigned "all loan agreements, promissory notes, mortgages, security agreements, UCC Financing Statements, guaranty agreements and all other Loan Files" "arising from the original Loan dated June 13, 2008 by and between Assignor and 410 Centre" to LSREF2 Cobalt, LLC. (PX9 (Exhibit 1); *see also* PX8 (Assignment of Deed of Trust, Security Agreement and Assignment of Leases, and Fixture Filing).) On the same day, LSREF2 Cobalt, LLC, transferred the note and assigned the Loan Documents, including the guaranty, to LSREF2

Cobalt Trust 2013. (PX10, 11.) That Trust then transferred the note and assigned all the Loan Documents to Wells Fargo. (PX12, 13.)

On November 1, 2013, Wells Fargo transferred the note and assigned the Loan Documents, including the guaranty, to Cobalt. (PX14, 15.) In the transfer documents, Wells Fargo assigned and conveyed all of its right, title, and interest in the note, deed of trust, and "[a]ny and all documents executed or delivered in connection with any of the foregoing and any and all amendments, modifications, supplements and/or replacements thereto." (PX15 (Schedule I).)

Cobalt's corporate representative, Marisa McGaughey (2RR:38-40), testified that she was familiar with the loan to 410 Centre because "[i]t is and was a part of a portfolio acquisition from BMO Harris Bank purchased by LSREF2 Cobalt, L.L.C. and I managed that portfolio. The legal work associated with it." (2RR:44.) She personally participated in the September 25, 2013, transfers and assignments:

> I was involved actually before the transaction even occurred in helping evaluate the loan portfolio that LSREF2 Cobalt, L.L.C. was contemplating purchasing from BMO Harris Bank. And then on the date of September 25th of 2013, I was present when all of the assignments were being reviewed, put in proper order, and executed and notarized.

(2RR:69.) McGaughey also participated in the November 1, 2013, transaction for the transfer of the note, and the assignment of the guaranty and related Loan Documents to Cobalt. (2RR:72.) McGaughey explained "[t]he allonges are

29

drafted and put in place in order to fully transfer the actual note and then the assignments are drafted and put in place to transfer all the other loan documents." (2RR:70.)[12]

Thus, according to McGaughey, Cobalt is the "current owner and holder of the note" (2RR:64, 76) and beneficiary of the guaranty. (2RR:76.) Urbahns admitted that no entity other that Cobalt (or its servicer) had made demand on him for payment of the note and guaranty. (3RR:75.)

3. **Prerequisites to foreclosure were all satisfied, and the amount of the deficiency was a simple mathematical calculation that was proved conclusively.**

410 Centre did not pay the loan when it matured on September 30, 2011 (PX7 (¶ E)), and Urbahns admitted the loan was not paid off during the two-year forbearance period or when the forbearance period expired on September 30, 2013. (3RR:74-76.)

On October 15, 2013, Wells Fargo gave proper notice of the November 5, 2013, foreclosure sale to Defendants (PX21, 25) and the Notice of Successor Trustee's Sale was timely, properly filed, and posted at the Bexar County

---

[12] McGaughey explained why there were multiple assignments: LSREF2 Cobalt, LLC was the initial acquiring entity – it acquired a loan portfolio of approximately 150 loans from BMO. Certain loans that were actively performing, or under a forbearance agreement, were subsequently transferred to LSREF2 Cobalt Trust 2013. Wells Fargo financed the acquisition, and, as part of the financing, the entire portfolio of loans was sold to Wells Fargo either from LSREF2 Cobalt, LLC or from LSREF2 Cobalt Trust 2013. (2RR:69-70.)

Courthouse. (PX23-25.) The foreclosure sale was properly conducted at the date, time, and place stated in the notice. (PX26.)[13]

The property was sold to Cobalt for a $2,800,000.00 credit bid. (PX26.) On the sale date, the total indebtedness (including principal and interest) was $5,154,201.78. (2RR:102-03.) After crediting the foreclosure sales price, the deficiency due and owing as of January 31, 2014, was $2,402,164.47, after allowing all just and lawful offsets, payments, and credits. (2RR:104-05.) From January 31, 2014, forward, interest continues to accrue on the deficiency at the rate of $527.06 per day. (2RR:105.)

Testimony proving the amount of the deficiency was not challenged by Urbahns.[14] He admitted that as of November 5, 2013, "there was a balance due and owing on this debt." (3RR:78-79.) But when asked the principal balance due as of that date, Urbahns testified "I have no idea" and said "[y]ou'd have to ask my accounting people." (3RR:79, 80.) Asked whether he had asserted a different

---

[13] The deed of trust provides that all statements of fact or other recitals made in any deed by a Trustee or any successor "shall be taken as prima facie evidence of the truth of the facts so stated and recited." (PX3 (¶ 5.4).)

[14] Urbahns did claim he did not owe Cobalt any money, but that was based solely on his argument that "[t]he property they purchased exceeded the value of the note and therefore I don't owe them anything." (3RR:65-66.) This is not conflicting testimony about the deficiency because the question whether 410 Centre and Urbahns have a right to a fair market value credit under Property Code § 51.003 is one of law. As shown above, they have no such right as a matter of law.

31

balance was owed than that claimed by Cobalt, Urbahns answered: "Defer to counsel." (3RR:81.)

Under the note's terms, and the undisputed facts, simple math established the amount of the deficiency conclusively, authorizing judgment for a sum certain.

### 4.     Cobalt conclusively proved its claim for attorneys' fees.

Cobalt also alleged a claim for attorneys' fees pursuant to the terms of the note, guaranty, and Chapter 38 of the Civil Practice and Remedies Code. (CR:141 (¶¶ 17, 28).) Both the note and guaranty provide that 410 Centre and Urbahns, respectively, shall pay "reasonable attorneys' fees incurred by Lender in connection with" the enforcement of any provision contained in the note and guaranty and the collection of any indebtedness evidenced by the note and guaranty. (PX2 (note ¶ 5); PX4 (guaranty ¶ 2).)

At trial, the parties "agreed to stipulate to the amount of attorney's fees in the same amount, both sides, along with the conditional award with what is reasonable in this case" as follows: $140,000 through trial; along with conditional awards for post-trial matters:

- if a motion for new trial is filed, but denied: $5,500;

- if an appeal is taken to the court of appeals, but is unsuccessful: $22,500;

- if a petition for review is filed, but not granted by the Texas Supreme court: $5,500;

32

- if review is granted by the Texas Supreme Court, but the appeal is unsuccessful: $18,500;

(3RR:3-4.)

Because "[t]he amount and reasonableness of attorney's fees is a question of fact," parties are "free to stipulate to the amount and reasonableness of attorney's fees, and such stipulation is binding on the parties, the trial court, and this court." *Morgan v. Ebby Halliday Real Estate, Inc.*, 873 S.W.2d 385, 390 (Tex. App.—Fort Worth 1993, no writ).

Because the stipulation is binding, Cobalt is also entitled to attorney's fees for the stipulated amounts. *Paciwest, Inc. v. Warner Alan Props., LLC*, No. 02-10-00378-CV, 2012 WL 3499603 (Tex. App.—Fort Worth Aug. 16, 2012, pet. denied) (modifying judgment to award the full amount of attorneys' fees stipulated by the parties).

**CONCLUSION AND PRAYER**

Cobalt conclusively proved its claims for a deficiency and for attorneys' fees. Defendants' arguments to avoid their obligations under the note and guaranty are without merit as a matter of law.

Cobalt prays that this Court reverse the trial court's judgment and render judgment for Cobalt for the amount of the deficiency (2RR:102-03) plus interest. In addition, the Court should render judgment for Cobalt for attorneys' fees to which the parties stipulated (through trial and this appeal) in the amount of

33

$162,500.00. In the alternative, Cobalt prays that the Court reverse and remand this matter for entry of judgment consistent with this Court's opinion.

Alternatively, in the event the court rules that there are fact issues that prevent entry of a judgment for a certain deficiency amount, Cobalt prays that the court reverse the judgment and remand the case to the trial court under Tex. R. App. P. 44.1(b) for new trial on only those issues.

Cobalt prays for such other and further relief to which it shows itself entitled.

Respectfully submitted,-

LANGLEY & BANACK, INC.


/s/ Catherine M. Stone
Catherine M. Stone
cstone@langleybanack.com
 Texas Bar No. 19286000
LANGLEY & BANACK, INC.
745 E. Mulberry Avenue, Suite 900
San Antonio, Texas  78212
(210) 736-6600; (210) 735-6889 Fax

Mike Hatchell
  Texas Bar No. 09219000
LOCKE LORD LLP
600 Congress Avenue, Suite 2200
Austin, Texas  78701-2748
(512) 305-4700

David L. Swanson
  Texas Bar No. 019554625
Thomas F. Loose
 Texas Bar No. 12561500
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-6776
(214) 740-8000; (214) 740-8800 Fax

Cliff A. Wade
cliff@cliffwadelaw.com
  Texas Bar No. 24013699
CLIFF WADE LAW
3131 McKinney Avenue, Suite 600
Dallas, Texas  75204
(214) 800-2090

ATTORNEYS FOR APPELLANT

35

# CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), as amended effective December 1, 2012, the undersigned certifies that this Brief complies with the length limitations of Rule 9.4(i) and the typeface requirements of Rule 9.4(e).

1.     Exclusive of the contents excluded by Rule 9.4(i)(1), this Brief contains 7,509 words as counted by the Word Count function (including textboxes, footnotes, and endnotes) of Microsoft Office Word 2010.

2.     This Brief has been prepared in proportionally spaced typeface using:

Software Name and Version:  Microsoft Office Word 2010
Typeface Name:  Times New Roman
Font Size:  14 point

/s/     Catherine M. Stone
Catherine M. Stone

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of December, 2015, a true and correct copy of Appellant's Brief was served by eFileTXcourts.gov on Appellees through its counsel of record listed below:

Peter M. Kelly
pkelly@texasappeals.com
State Bar No. 00791011
KELLY, DURHAM & PITTARD, L.L.P.
1005 Heights Boulevard
Houston, Texas 77008

Randall A. Pulman
rpulman@pulmanlaw.com
Thomas Rice
trice@pulmanlaw.com
PULMAN, CAPPUCCIO, PULLEN, BENSON & JONES LLP
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213

/s/    Catherine M. Stone
Catherine M. Stone

# No. 04-15-00633-CV

## In the Fourth Court of Appeals
## San Antonio, Texas

LSREF2 COBALT (TX), LLC, a Foreign Limited Liability Company,
Appellant

v.

410 CENTRE LLC, a Foreign Limited Liability Company,
and JOHN B. URBAHNS, an Individual
Appellees

*On Appeal from the 408th District Court*
*Bexar County, Texas; Cause No. 2013-CI-20922*

## APPENDIX TO APPELLANT'S BRIEF

Trial Court's Judgment (CR:2035) ......................................................................... A

Note (6RR:PX2) ...................................................................................................... B

Guaranty (6RR:PX4) ............................................................................................... C

Forbearance Agreement (6RR:PX7) ....................................................................... D

Pre-Negotiation Agreement (6RR:PX31) ................................................................ E

**TAB A**



2013CI20922 -D408

CAUSE NO. 2013-CI-20922

| | | |
|---|---|---|
| LSREF2 COBALT (TX) LLC, A FOREIGN LIMITED LIABILITY COMPANY, | § § § | IN THE DISTRICT COURT |
| PLAINTIFF | § § § | |
| V. | § § | 408TH JUDICIAL DISTRICT |
| 410 CENTRE LLC, A FOREIGN LIMITED LIABILITY COMPANY, AND JOHN B. URBAHNS, AN INDIVIDUAL, | § § § § § | |
| DEFENDANTS | § | BEXAR COUNTY, TEXAS |

## FINAL JUDGMENT

Came before the Court Plaintiff, LS₁ EF2 COBALT (TX) LLC, and Defendants, 410 CENTRE LLC and JOHN B. URBAHNS for trial on the merits. Plaintiff, LSREF2 COBALT (TX) LLC, appeared in person and through counsel of record. Defendants, 410 Centre, LLC and John B. Urbahns (collectively, "Defendants") appeared in person and through counsel of record.

The Court determined that it had jurisdiction over the parties and the subject matter of the case. The parties, having waived a trial by jury, announced ready, proceeded to trial, and submitted all matters in controversy, both factual and legal, to the Court. The Court, having reviewed the pleadings, considered the testimony and documentary evidence, and having heard the arguments of counsel, is of the opinion that neither the Plaintiff nor the Defendants are entitled to any relief against the other.

**IT IS THEREFORE ORDERED, ADJUDGED,** and **DECREED** that Plaintiff shall take nothing on all of its claims alleged against Defendant, 410 CENTRE LLC. It is further

**ORDERED, ADJUDGED,** and **DECREED** that Plaintiff shall take nothing on all of its claims alleged against Defendant, JOHN B. URBAHNS. It is further

2035

2

**ORDERED, ADJUDGED,** and **DECREED** that Defendants take nothing on all of their counter-claims alleged against Plaintiff, LSREF2 COBALT (TX) LLC. It is further

**ORDERED, ADJUDGED,** and **DECREED** that all costs are taxed against the party incurring same and all parties are to bear their own attorneys' fees. It is further

**ORDERED, ADJUDGED,** and **DECREED** that all relief not expressly granted in this judgment is denied, and that this judgment finally disposes of all parties and all claims and is appealable.

**SIGNED** and **ENTERED** this 14 day of July, 2015.

DISTRICT COURT JUDGE

2036

– 2 –

**TAB B**

## PROMISSORY NOTE

$5,100,000.00

June _13_ 2008
Indianapolis, Indiana

FOR VALUE RECEIVED, 410 CENTRE LLC, an Indiana limited liability company (hereinafter referred to as "Maker"), unconditionally promises to pay to the order of M&I MARSHALL & ILSLEY BANK, having its principal banking offices at 135 North Pennsylvania Street, Indianapolis, Indiana 46204 (hereinafter referred to as "Lender"), at its principal banking offices or at such other place or to such other party as Lender may from time to time designate, the principal sum of Five Million One Hundred Thousand and 00/100 Dollars ($5,100,000.00), or so much thereof as shall be advanced to or for the benefit of Maker, with interest on the principal balance from time to time remaining unpaid as provided for in this Note.

### TERMS, PROVISIONS AND CONDITIONS

1.    Definitions. In addition to the words and phrases defined elsewhere in this Note, the following terms shall have the meaning indicated when capitalized and used herein:

"Adjusted LIBOR" shall mean, for each LIBOR Interest Period, a rate per annum (expressed as a percentage and rounded upwards, if necessary, to the nearest 1/16 of 1%) determined by Lender to be equal to a fraction, (a) the numerator of which is equal to LIBOR for such LIBOR Interest Period, and (b) the denominator of which is equal to the sum of (i) 1 minus (ii) the Reserve Requirement (if any) for such LIBOR Interest Period.

"Applicable Rate" shall mean the rate of interest which the terms of this Note expressly provide shall be in effect from time to time with respect to the principal outstanding under this Note.

"Business Day" shall mean any day of the week (but not a Saturday, Sunday or holiday) on which the offices of Lender are open to the public for carrying on substantially all of Lender's business functions. Unless specifically referenced in this Note as a Business Day, all references to "days" shall be to calendar days.

"Consequential Loss" shall mean, with respect to the termination or cancellation of the LIBOR Base Rate in effect for the principal balance outstanding under this Note pursuant to the provisions of this Note earlier than the last applicable Eurodollar Business Day of the LIBOR Interest Period, any loss, expense, penalty or premium incurred by Lender on account of such premature termination or cancellation of such LIBOR Base Rate. Any certificate of Lender delivered to Maker setting forth the amount of Consequential Loss as provided herein shall show the calculations required to determine such Consequential Loss and shall be conclusive and binding, absent manifest error, as to such amount and determination.

Page 1 of 16

COBALT 000001

PLAINTIFF EXHIBIT NO. 2

"Deed of Trust" shall mean that certain Deed of Trust, Security Agreement and Assignment of Leases and Fixture Filing of even date herewith, executed and delivered by Maker to Lender as from time to time amended or modified.

"Default Rate" shall mean the rate of interest to take effect under this Note during any period in which an Event of Default exists hereunder, such rate of interest shall be equal to a rate or rates per annum which is four percent (4%) above the interest rate or rates otherwise applicable under this Note, not to exceed, however, the Maximum Rate.

"Eurodollar Business Day" shall mean a day on which transactions in U.S. dollars are conducted in the Interbank Eurodollar market in London, England at 11:00 o'clock a.m. London time and on which Lender is open to conduct normal banking business in Indianapolis, Indiana.

"Event of Default" shall mean the occurrence of any event or condition under Section 10 of this Note and the expiration of any applicable cure period specified therein.

"Extended Maturity Date" shall mean, following the Original Maturity Date, the earliest to occur of (i) June 30, 2011, or (ii) the date on which the outstanding principal balance of this Note is accelerated upon the occurrence of an Event of Default.

"Governmental Authority" shall mean any foreign governmental authority, the United States of America, any State of the United States and any political subdivision of any of the foregoing and any agency, department, commission, board or bureau or court which has jurisdiction over Lender or Maker or their respective assets or property, including the loan evidenced hereby, or is charged with the interpretation or administration of any law, rule, regulation or treaty which affects the ability of Lender to establish a loan.

"LIBOR" shall mean for each LIBOR Interest Period, as of the applicable date and time for determination provided herein, a per annum rate of interest equal to the rate which Lender determines, in its sole discretion, is generally the market rate offered by leading banks in the London interbank market as of 11:00 a.m., London time, two (2) Eurodollar Business Days prior to the first day of the applicable LIBOR Interest Period, for United States dollar deposits in the amount of the stated principal amount of this Note having a term coinciding with such LIBOR Interest Period, adjusted for any reserve requirements and any subsequent costs arising from a change in government regulation. Lender may make such determination based on the rate reported by any publicly available source of market data selected by Lender that, in its sole judgment, accurately reflects such rate offered by leading banks in the London interbank market, including without limitation any of the following sources which Lender may select to use in it sole discretion: (i) Reuters Screen LIBOR01 Page (or any successor or substitute thereto selected by Lender in its sole discretion), (ii) the Wall Street Journal, or (iii) such other comparable financial information reporting service used by the Lender at the time such rate is determined.

COBALT 000002

"**LIBOR-Based Rate**" shall mean, for each LIBOR Interest Period, the sum of (a) Adjusted LIBOR, plus (b) the LIBOR Margin.

"**LIBOR Designation Notice**" shall mean a written notice from Maker substantially in the form of Exhibit "A", attached hereto and by reference made a part hereof, or in such other form as Lender may from time to time require, pursuant to which Maker elects to have a LIBOR-Based Rate apply for a specified LIBOR Interest Period with respect to the principal balance outstanding under this Note, and which contains such information and certifications as Lender may require.

"**LIBOR Margin**" shall mean two hundred (200) basis points.

"**LIBOR Interest Period**" shall mean each calendar month during which any portion of the principal balance of this Note is outstanding, provided however, if the initial advance of the principal of this Note occurs other than on the first day of a calendar month, then the initial LIBOR Interest Period shall be the period which begins with the date of the initial advancement of the principal of this Note and ends on the first day of the calendar month following the month in which the initial advancement of the principal of this Note was made. Each succeeding LIBOR Interest Period shall begin on the first day of each calendar month and shall end on the first day of the next calendar month.

"**Loan Agreement**" shall mean that certain Loan Agreement dated of even date herewith, executed by and between Maker and Lender, and/or any direct or remote agreement amending or restating such Loan Agreement, as from time to time amended or modified.

"**Loan Documents**" shall mean collectively, this Note, the Deed of Trust, the Loan Agreement and all other agreements, security instruments and guaranties which secure or extend to this Note or are executed by Maker or any guarantor in connection with the indebtedness evidenced by this Note, as such documents and agreements may be modified or amended from time to time and/or any documents and agreements which replace or restate such documents and agreements.

"**Maximum Rate**" shall mean the maximum rate of interest permitted by applicable law to be in effect from time to time under this Note.

"**Notice of Extension**" shall mean a written Notice of Extension issued by Lender in accordance with the terms and conditions of the Loan Agreement.

"**Original Maturity Date**" shall mean the earliest to occur of (i) June 30, 2010, or (ii) the date on which the outstanding principal balance of this Note is accelerated upon the occurrence of an Event of Default.

"**Prime-Based Rate**" shall mean a rate of interest equal to the Prime Rate, from time to time in effect, minus fifty (50) basis points.

COBALT 000003

"Prime Designation Notice" shall mean a written notice from Maker substantially in the form of Exhibit "B", attached hereto and by reference made a part hereof, or in such other form as Lender may from time to time require, pursuant to which Maker elects to have the Prime-Based Rate apply with respect to the principal balance outstanding under this Note, and which contains such information and certifications as Lender may require.

"Prime Rate" shall mean the rate from time to time posted by Lender as its "Prime Rate", with the interest rate hereunder to change effective on the same date as each change of such Prime Rate, or in the event such Prime Rate is not available or in effect at any point in time, a comparable rate selected by the holder of this Note. Such Prime Rate is not necessarily the rate at which Lender lends its funds. Such Prime Rate is only an index rate from which interest rates actually charged to Lender's customers may be measured. The use of such Prime Rate does not constitute a commitment by Lender to lend money at a preferred rate.

"Regulatory Change" shall mean, with respect to Lender, any change after the effective date of this Note in federal, state or foreign law or regulations (including Regulation D) or the adoption or making after such date of any interpretation, directive or request applying to a class of banks including Lender of or under any federal, state or foreign law or regulations (whether or not having the force of law and whether or not failure to comply therewith would be unlawful) by any Governmental Authority or monetary authority charged with the interpretation or administration thereof.

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System from time to time in effect and shall include any successor or other regulation relating to reserve requirements applicable to member banks of the Federal Reserve System.

"Regulation K" shall mean Regulation K of the Board of Governors of the Federal Reserve System from time to time in effect and shall include any successor or other regulation relating to reserve requirements applicable to member banks of the Federal Reserve System.

"Reserve Requirement" shall mean, for any LIBOR Interest Period, the average maximum rate (expressed as a percentage) at which reserves (including, without limitation, any basic, marginal, supplemental or emergency reserves) are required by the Board of Governors of the Federal Reserve System (or any successor) to be maintained by Lender during such LIBOR Interest Period under Regulation D with respect to "Eurocurrency liabilities" (as such term is used in Regulation D). Without limiting the effect of the foregoing, the Reserve Requirement shall include any other reserves required to be maintained by Lender by reason of any Regulatory Change with respect to (i) any category of liabilities that includes deposits by reference to which LIBOR is to be determined as provided in the definition of "LIBOR" in this Note or (ii) any category of extensions of credit or other assets that includes loans accruing interest at a LIBOR based

COBALT 000004

rate. Each determination by Lender of a Reserve Requirement, in the absence of manifest error, shall be conclusive and binding.

## 2. Interest Rate.

2.1 Computation of Interest. The principal balance of this Note from time to time outstanding shall bear interest as follows:

(a) The principal balance of this Note from time to time outstanding shall bear interest at the LIBOR-Based Rate, unless and except to the extent that the Prime-Based Rate or the Default Rate is applicable in accordance with the terms and provisions of this Note.

(b) If at any time Maker has elected the Prime Base Rate to apply with respect to this Note or in the event any condition for the use of the Prime-Based Rate set forth in Section 2.6 of this Note applies, then the principal balance of this Note from time to time outstanding shall bear interest at the Prime-Based Rate, unless and except to the extent that the Default Rate is applicable in accordance with the terms and provisions of this Note.

2.2 Designation of LIBOR-Based Rate and Prime Base Rate. Unless Maker has elected the Prime-Based Rate to apply with respect to this Note or the Prime-Based Rate or the Default Rate is otherwise in effect in accordance with the terms and provisions of this Note, the LIBOR-Based Rate shall be in effect under this Note. At any time during the term of this Note when the LIBOR-Based Rate is in effect, Maker may elect to have the Prime-Based Rate apply to all of the principal balance outstanding under this Note upon the expiration of the then current LIBOR Interest Period by submitting to Lender a written Prime Designation Notice. At any time during the term of this Note when the Prime-Based Rate is in effect, provided the conditions for the use of the Prime-Based Rate or the Default Rate do not otherwise apply, Maker may elect to have the LIBOR-Based Rate apply to all of the principal balance outstanding under this Note effective as of the first day of the next calendar month by submitting to Lender a written LIBOR Designation Notice. It is intended that, except for the initial LIBOR Interest Period, each LIBOR Interest Period shall begin on the first day of a calendar month and shall end on the last day of a calendar month. If Maker requests changing the interest rate effective with respect to this Note from the Prime-Based Rate to the LIBOR-Based Rate, then the new interest rate with respect to this Note shall become effective on the first day of the next calendar month following the date Maker submits the interest rate designation notice to Lender. The LIBOR-Based Rate shall automatically renew with respect to this Note for consecutive LIBOR Interest Periods until Maker provides a written Prime Designation Notice with respect to this Note. If Maker requests changing the interest rate effective with respect to this Note from the LIBOR-Based Rate to the Prime-Based Rate, then the new interest rate with respect to this Note shall become effective on the expiration of the then current LIBOR Interest Period following the date Maker submits the interest rate designation notice to Lender. If Maker has elected to have the Prime-Based Rate apply to the principal of this Note, then the Prime-Based Rate shall continue

COBALT 000005

to apply until Maker provides a new written LIBOR Designation Notice and such change in interest rate has become effective pursuant to the terms hereof. Notwithstanding any other provision hereof, during any period in which any condition for the use of the Prime-Based Rate set forth in Section 2.6 of this Note applies, the obligation of Lender to accept or implement LIBOR Designation Notices shall be suspended and, at the option of Lender, upon the expiration of any applicable LIBOR Interest Period the rate of interest applicable under this Note shall be the Prime-Based Rate and the Default Rate shall then be determined based upon such Prime-Based Rate being in effect.

2.3 360 Day Year. Interest shall be calculated daily on the basis of a 360-day year applied to the actual number of days in each interest-payment period.

2.4 Limited to Maximum Rate. Notwithstanding anything expressed or implied herein to the contrary, if at any time the Applicable Rate exceeds the Maximum Rate, then the rate of interest on this Note shall be limited to the Maximum Rate, but any subsequent reduction in the Applicable Rate shall not reduce the rate of interest on this Note below the Maximum Rate until the total amount of interest accrued on this Note equals the amount of interest which would have accrued if the Applicable Rate had at all times been in effect.

2.5 [This paragraph is intentionally left blank]

2.6 Use of Prime-Based Rate. During any period in which there exists an Event of Default hereunder, the obligation of Lender to accept or implement the LIBOR-Based Rate with respect to any new LIBOR Interest Period shall be suspended and, at the option of Lender, upon the expiration of any LIBOR Interest Period the rate of interest applicable to the principal balance of this Note to which such LIBOR Interest Period applied shall be the Prime-Based Rate and the Default Rate shall then be determined based upon the Prime-Based Rate being in effect. If, with respect to any LIBOR Interest Period, Lender determines (which determination, in the absence of manifest error, shall be conclusive and binding) that:

(a) for any reason, Lender is unable, through its customary general practices, to obtain a quote offered by prime banks in the Interbank Eurodollar market in London, England, for deposits in U.S. dollars in the appropriate amounts for the appropriate period;

(b) by reason of national or international financial, political or economic conditions or by reason of any applicable law, treaty, rule or regulation (whether domestic or foreign) now or hereafter in effect, or in the interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof, or compliance by Lender with any request or directive of such authority (whether or not having the force of law), including without limitation exchange controls, it is impracticable, unlawful or impossible for Lender to utilize LIBOR for setting the interest rate from time to time in effect under this Note;

Page 6 of 16

COBALT 000006

(c)    by reason of circumstances affecting the Interbank Eurodollar market in London, England generally, the offer of Lender to accept deposits in U.S. dollars (in the applicable amounts) will not be accepted in that Interbank Eurodollar market for such LIBOR Interest Period; or

(d)    the LIBOR-Based Rate will not adequately and fairly reflect the cost to Lender of the maintenance of this Note for such LIBOR Interest Period;

and Lender gives notice thereof to Maker, then the obligation of Lender to accept or implement the LIBOR-Based Rate with respect to any new LIBOR Interest Period shall be suspended until Lender notifies Maker that the circumstances giving rise to such suspension no longer exist. If after the date hereof, the adoption of any applicable law, rule or regulation or any change in applicable law, rule or regulation or in the interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof or compliance by Lender with any request or directive (whether or not having the force of law) of any such Governmental Authority, shall make it unlawful or impossible for Lender to comply with its obligations in connection with any LIBOR Interest Period, then the commitment of Lender to accept or implement the LIBOR-Based Rate with respect to any new LIBOR Interest Period shall be automatically canceled and terminated. Furthermore, if it shall then be unlawful or impossible as aforesaid for Lender to permit or participate in the continuation of the LIBOR-Based Rate with respect to any portion of this Note, then (i) the LIBOR-Based Rate shall terminate with respect to such portion of this Note, and (ii) upon notice being given by Lender to Maker, Maker shall pay to Lender promptly upon demand a cash amount equal to (a) the Consequential Loss, plus (b) the amount required to compensate Lender for all additional costs and expenses, if any, which it incurred in connection with the implementation of the LIBOR-Based Rate as a result of such change in applicable law or regulations or in the interpretation thereof or as a result of Lender's compliance with any such request or directive of any such Governmental Authority. Lender will promptly notify Maker of any event of which it has knowledge which will make it unlawful or impossible to have the LIBOR-Based Rate applicable with respect to any portion of this Note.

2.7    Additional LIBOR Costs. If any applicable law, treaty, rule or regulation (whether domestic or foreign) now or hereafter in effect, or any Regulatory Change therein, or any interpretation or change in interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof, or compliance by Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority shall:

(a)    subject Lender (or makes it apparent that it is subject) to any tax (including without limitation any U.S. interest equalization or other tax, however named), levy, impost, duty, charge, fee (collectively "Taxes"), or any deduction or withholding for any Taxes on or from any payment due from Maker with respect

COBALT 000007

to any portion of this Note, other than income and franchise taxes of the United States and its political subdivisions imposed on Lender;

(b)     change the basis of taxation of payments due from Maker to Lender under any portion of this Note (other than by a change in the rate of taxation of the overall net income of Lender);

(c)     impose, modify, increase or deem applicable any reserve requirement (but excluding that portion of any reserve requirement included in the calculation of the Reserve Requirement), special deposit requirement or similar requirement (including, but not limited to, state law requirements, Regulation D and Regulation K) imposed or deemed applicable by any Governmental Authority charged with the interpretation or administration of such requirements or deemed applicable against foreign assets held by or against loans made by Lender or against any other funds, obligations or other property owned or held by Lender;

(d)     affect the amount of capital required or expected to be maintained by Lender or any corporation controlling Lender and Lender determines the amount of capital required is increased by or based upon the existence of this Note or its obligation to make the loans evidenced hereby; or

(e)     impose on Lender any other condition regarding any portion of this Note;

and the result of any of the foregoing is to increase (by an amount deemed by Lender to be material) the cost to Lender of having the LIBOR-Based Rate applicable to any portion of this Note (or in the case of any capital adequacy or similar requirement, to have the effect of reducing the rate of return on Lender's capital taking into account Lender's customary policies with respect to capital adequacy), or to reduce the amount of principal or interest or other sum received or receivable by Lender (by an amount deemed by Lender to be material), then upon five (5) days' written notice from Lender to Maker, Maker shall pay to Lender, from time to time as specified by Lender, such additional amount or amounts as will compensate Lender for such increased cost or reduced receipts or receivables. Lender's determination of the amount of any such increase in cost or reduction in amounts received or receivable, in the absence of manifest error, shall be conclusive and binding. If Lender demands compensation under this Section, then Maker may at any time, upon at least three (3) Eurodollar Business Days' prior notice to Lender, (a) give notice to Lender that it is canceling the LIBOR-Based Rate with respect to such applicable portion of this Note, whereupon each such election so canceled shall terminate and Maker shall be obligated to pay Lender upon demand an amount equal to all Consequential Loss, if any, resulting therefrom, and (b) convert the LIBOR-Based Rate on such applicable portion of this Note to the Prime-Based Rate. Any certificate of Lender delivered to Maker setting forth the determination of any additional amounts payable pursuant to this Section shall be conclusive and binding, absent manifest error, as to such determination and amount. The obligations, agreements and covenants of Maker

Page 8 of 16

COBALT 000008

contained in this Section 2.7 shall survive the termination of this Note and the payment in full of all indebtedness evidenced by this Note.

3.    Payments. Principal and interest shall be payable as follows:

    3.1    Interest Payments.    Accrued and unpaid interest shall be payable commencing on the first day of the first calendar month following the calendar month in which the first advancement is made hereunder and continuing on the first day of each calendar month thereafter until this Note is paid in full; and

    3.2    Payment on Original Maturity Date. If a written Notice of Extension has not been issued by Lender in accordance with the terms and conditions of the Loan Agreement, then on the Original Maturity Date the entire unpaid principal balance and all accrued interest shall be due and payable. .

    3.3    Payment on Extended Maturity Date. If a written Notice of Extension has been issued by Lender in accordance with the terms and conditions of the Loan Agreement, then on the Extended Maturity Date the entire unpaid principal balance and all accrued interest shall be due and payable.

4.    Prepayments. Provided Maker has paid in full all accrued interest, fees and other amounts then due and payable to Lender and all breakage and other termination fees which might be payable by Maker in connection with any "Rate Management Transaction" (as that term is defined in the Deed of Trust) entered into by Maker and Lender or any affiliate of Lender, Maker shall have the privilege of prepaying any portion of the principal outstanding under this Note on any Business Day, after at least five (5) Business Days prior written notice to Lender, without the payment of a yield maintenance fee or prepayment penalty.

5.    Cost of Collection and Default Rate of Interest. In addition, Maker shall pay to Lender (a) reasonable attorneys' fees incurred by Lender in connection with (i) the protection of any security for or rights arising in connection with this Note, (ii) the enforcement of any provision contained in this Note or in any document executed in connection herewith, or (iii) the collection of any indebtedness evidenced hereby or arising in connection herewith (including without limitation attorneys fees incurred by Lender in connection with any bankruptcy, reorganization, receivership or other proceeding affecting creditor's rights and involving a claim under this Note or any document executed in connection herewith), (b) costs of collection, (c) during any period in which an Event of Default exists hereunder and/or any period of delinquency on any amounts not paid when due, interest at the Default Rate, and (d) interest at the Default Rate on all accrued interest which is not paid when due. If, after the occurrence of an Event of Default hereunder, Lender employs an attorney or attorneys to protect Lender's rights or remedies arising in connection with this Note or any security for this Note, then Maker shall pay to Lender upon demand all attorneys fees and expenses incurred by Lender in connection with such event of default, regardless of whether any action is actually commenced against Maker by reason of any such event of default.

COBALT 000009

6. **Valuation and Appraisement Laws.** All principal, interest and other amounts payable under or with respect to this Note shall be payable without relief from valuation and appraisement laws.

7. **Late Charge.** Maker shall pay a "late charge" for the purpose of defraying expense incident to handling with respect to any monthly installment of interest and/or principal, or portion thereof, payable hereunder not paid within ten (10) days after the date when first due, at the rate of five cents (5¢) for each One and no/100 Dollar ($1.00) so overdue, with a minimum charge of Twenty-Five and no/100 Dollars ($25.00) and an additional "late charge" for purposes of defraying expense incident to handling on the first day of each successive calendar month thereafter at the rate of five cents (5¢) for each One and no/100 Dollar ($1.00) so overdue, with a minimum charge of Twenty-Five and no/100 Dollars ($25.00) per month until any such installment, or portion thereof, has been paid in full. Notwithstanding anything contained herein to the contrary, no "late charge" shall be payable with respect to the final payment due upon the maturity, or the early acceleration, of this Note. Provided, however, nothing herein contained shall be construed as a waiver by Lender of its option to declare a default if any payment of any monthly installment of interest and/or principal, or portion thereof, is not made when due, and the assessment of a late charge shall not affect the right of Lender to increase the rate of interest as herein provided on all amounts not paid when due.

8. **Security.** This Note is given to evidence indebtedness of Maker to Lender arising in connection with the terms, provisions and conditions of the Loan Agreement. This Note shall be entitled to the benefits of and is secured by (a) a certain Assignment of Leases and Rents of even date herewith executed by Maker to Lender, as from time to time amended or modified, (b) the Deed of Trust, (c) any other security agreements or documents, as from time to time amended or modified, executed to Lender in connection with this Note, and (d) any funds of Maker on deposit with Lender.

9. **Application of Payments.** Each payment hereunder shall be applied to the payment of accrued and unpaid interest, the principal balance outstanding under this Note and any other sums payable to Lender in connection with this Note or any documents entered into by Maker in connection herewith, in such order and in such amounts as Lender shall determine in its sole discretion. Such order may include, without limitation, the application first to any advance made by Lender under the terms of any instruments securing this Note which has not been repaid, then to any costs of collection or other costs or expenses for which Maker is obligated to reimburse Lender pursuant to this Note or pursuant to any document executed in connection with this Note, then to any late charges due and owing under this Note, then to any accrued and unpaid interest, and then to the principal balance outstanding. All amounts advanced by Lender (in addition to the principal advanced under this Note) pursuant to applicable provisions of the Deed of Trust, the Loan Agreement or any other document entered into by Maker in connection with this Note, together with interest at the Default Rate or other charges as provided therein, shall be added to and immediately due and payable under this Note. In the event any such advance is not so repaid by Maker, Lender may, at its option, first apply any payments received hereunder to repay such advances together with any interest thereon or other charges, and the balance, if any, shall be applied toward the payment of interest and principal then due hereunder in such order as Lender shall determine, in its sole discretion. If the due date of any payment

COBALT 000010

under this Note shall be a day that is not a Business Day, then the due date shall be extended to the next succeeding Business Day and such extended time shall be included in the computation of interest. All amounts payable from time to time under this Note, including without limitation principal and interest payments, shall be due and payable in immediately available funds on the date each such payment is due at the principal office of Lender before the time of day which Lender from time to time designates as its cut-off time for considering deposits received as being received on such date (hereinafter referred to as the "Cut-Off Time"). In the event any payment is received by Lender after the Cut-Off Time on any day, such payment shall be deemed to be received as of the start of business on the next Business Day and, to the extent interest accrues on such amounts paid, interest shall continue to accrue until the next Business Day.

10.    Events of Default. Each of the following events shall constitute an Event of Default hereunder:

(a)    a failure by Maker to pay, within five (5) days when due, any installment of interest or principal due and payable pursuant to the terms of this Note;

(b)    a failure by Maker or any other obligor to pay, within five (5) days upon demand or when due, any other amounts due and payable pursuant to the terms of this Note or pursuant to the terms of any other document or agreement executed by Maker or any guarantor in connection with the indebtedness evidenced by this Note;

(c)    a default under or a failure to comply with any of the other terms, conditions, agreements or covenants of this Note and the continuation of such default or failure for a period of thirty (30) days after written notice of such default or failure has been sent to Maker; and

(d)    the occurrence of a default under any of the other Loan Documents and a failure to cure such default within the applicable cure period specified therein, if any.

11.    Remedies. Upon the occurrence of an Event of Default, all of the indebtedness evidenced by this Note and remaining unpaid, including without limitation the entire unpaid principal balance, any accrued and unpaid interest, all prepayment premiums payable hereunder, if any, and all other amounts payable under this Note, shall, at the option of Lender and without demand or notice, become immediately due and payable, anything contained in this Note to the contrary notwithstanding. Lender may exercise this option to accelerate regardless of any prior forbearance. Lender, at its option, shall have the right to perform all acts necessary for the performance, sale, collection and enforcement of any collateral securing this Note and/or any other agreement or document executed in connection herewith. Enforcement by Lender of any security for Maker's obligations under this Note shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right or remedy available to Lender. In addition to all other remedies available to Lender after an Event of Default hereunder, Lender may, without demand or notice of any kind, apply any funds of Maker on deposit with or in the possession of Lender toward the payment of any indebtedness outstanding under this Note, in such manner of application as Lender may choose. All rights and remedies of Lender herein

COBALT 000011

specified are cumulative and in addition to, not in limitation of, any rights and remedies which Lender may have by law or at equity.

12.    [This Section is intentionally left blank]

13.    Waiver and Consent. Presentment, notice of intent to accelerate, notice of acceleration, notice of dishonor and demand, valuation and appraisement, protest and diligence in collection and bringing suit are hereby severally waived by Maker and each endorser or guarantor, each of whom further consents that the time for the payment of this Note, or of any installment hereunder, may be extended from time to time without notice by Lender. All guarantors, sureties and accommodation parties of this Note hereby waive generally and specifically, to the extent waivable, any and all rights that they may have, by contract, at equity or under any state or federal law, to any defense, offset, claim in recoupment or counterclaim not specifically set forth herein.

14.    No Waiver. No waiver of any default or failure or delay to exercise any right or remedy by Lender shall operate as a waiver of any other default or of the same default in the future or as a waiver of any right or remedy with respect to the same or any other occurrence. The acceptance by Lender of any payment after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments or to exercise any right or remedy with respect to any failure to make prompt payment.

15.    Usury Laws. It is the intention of the parties hereto to comply strictly with all applicable usury laws. All agreements between Maker and Lender, whether now existing or hereafter arising and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of the maturity hereof, or otherwise, shall the amount paid, or agreed to be paid to Lender for the use, forbearance, or detention of the money to be loaned hereunder or otherwise or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing, or pertaining to the indebtedness evidenced hereby, exceed the maximum amount permissible under applicable law. If from any circumstance whatsoever fulfillment of any provision hereof or of such other documents, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law, then ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any such circumstance Lender shall ever receive as interest or otherwise an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the principal indebtedness of Maker to Lender, and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of principal hereof, such excess shall be refunded to Maker. All sums paid or agreed to be paid by Maker for the use, forbearance or detention of the indebtedness of Maker to Lender hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full in such manner that there will be no violation of applicable laws pertaining to the maximum rate or amount of interest which may be contracted for, charged or received with respect to such indebtedness. Maker shall not institute any action or file any defense based upon the charging or collecting of usurious interest hereunder unless (i) Maker shall give Lender

COBALT 000012

written notice of an intent to do so and (ii) Lender shall fail to comply with the terms hereof by making necessary adjustments as required by this Section, and notify Maker of such compliance within fifteen (15) days after receipt by Lender of such written notice from Maker. The provisions of this Section shall be given precedence over any other provision contained herein or in any other agreement between the parties hereto that is in conflict with the provisions of this Section.

16.     [This Section is intentionally left blank]

17.     Waiver of Trial by Jury. Maker hereby agrees that any suit, action or proceeding, whether a claim or counterclaim, brought or instituted by any party on or with respect to this Note or any other document executed in connection herewith or which in any way relates, directly or indirectly to this Loan Agreement or any event, transaction or occurrence arising out of or in any way connected with this Note or the dealings of the parties with respect thereto, shall be tried only by a court and not by a jury. MAKER, AND LENDER BY ACCEPTANCE OF THIS NOTE, HEREBY EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION OR PROCEEDING. Maker acknowledges that Maker may have a right to a trial by jury in any such suit, action or proceeding and that Maker hereby is knowingly, intentionally and voluntarily waiving any such right. Maker further acknowledges and agrees that this Section is material to this Note and that adequate consideration has been given by Lender and received by Maker in exchange for the waiver made by Maker pursuant to this Section.

18.     Notices. Any written notice permitted or required hereunder shall be effective when (a) mailed by certified United States mail, postage prepaid with return receipt requested or (b) sent by an overnight carrier which provides for a return receipt, to the applicable address specified below:

| | |
|---|---|
| If to Maker: | 410 Centre LLC |
| | 7914 North Shadeland Avenue |
| | Suite 200 |
| | Indianapolis, Indiana 46250 |
| | |
| If to Lender: | M&I Marshall & Ilsley Bank |
| | 135 North Pennsylvania Street |
| | Indianapolis, Indiana 46204 |
| | Attention: Russ Swan, Senior Vice President |

or to such other addresses within the State of Indiana as either Maker or Lender may from time to time specify for itself by notice hereunder. Any notice may be given on behalf of Lender or Maker by such party's legal counsel.

19.     Legal Tender. This Note is negotiable and is payable in lawful money of the United States of America which shall be legal tender in payment of all debts and dues, public and private, at the time of payment.

Page 13 of 16

COBALT 000013

20.     Successors and Assigns.  The obligations of Maker hereunder shall be binding upon Maker and Maker's successors, assigns and legal representatives (the reference to "Maker" in this Note shall be deemed to include, without limitation, such successors, assigns and legal representatives) and shall inure to the benefit of Lender and Lender's successors, assigns and legal representatives (the reference to "Lender" in this Note shall be deemed to include, without limitation, such successors, assigns and legal representatives, including, without limitation, any subsequent holder of this Note); provided however, that this Note cannot be assigned by Maker without the prior written consent of Lender, and any such assignment or attempted assignment by Maker shall be void and of no effect with respect to Lender.

21.     Joint and Several Obligations.  The obligations, agreements and covenants of the persons or entities constituting Maker hereunder are joint and several and unconditional.

22.     Governing Law.  This Note is delivered to Lender in the State of Indiana and is executed under and shall be governed by and construed in accordance with the laws of the State of Indiana, notwithstanding that Indiana conflicts of law rules might otherwise require the substantive rules of law of another jurisdiction to apply.

23.     Time of the Essence.  Time is of the essence with respect to each obligation and agreement of Maker under this Note.

24.     Invalidity of Any Provision.  If any provision (or portion thereof) of this Note or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, then the remainder of this Note or the application of such provision (or portion thereof) to any other person or circumstance shall be valid and enforceable to the fullest extent permitted by law.

25.     Commercial Purpose.  Maker represents that the indebtedness evidenced by this Note is being incurred by Maker solely for the purpose of carrying on a business or commercial enterprise, and not for personal, family or household purposes.  Maker represents to Lender that this Note evidences a business loan exempt from the Federal Truth in Lending Act (15 USC 1601, et seq.), Regulations G, U, X and Z of the Board of Governors of the Federal Reserve System, and the Indiana Uniform Consumer Credit Code (IC 24-4.5-3-101, et seq.).

26.     Continuing Enforcement.  If, after receipt of any payment of all or any part of this Note, Lender is compelled or agrees, for settlement purposes, to surrender such payment to any person or entity for any reason (including, without limitation, a determination that such payment is void or voidable as a preference or fraudulent conveyance, an impermissible setoff, or a diversion of trust funds), then this Note and the other Loan Documents shall continue in full force and effect or be reinstated, as the case may be, and Maker shall be liable for, and shall indemnify, defend and hold harmless Lender with respect to, the full amount so surrendered. The provisions of this Section shall survive the cancellation or termination of this Note and shall remain effective notwithstanding the payment of the obligations evidenced hereby, the release of any security interest, lien or encumbrance securing this Note or any other action which Lender may have taken in reliance upon its receipt of such payment. Any cancellation, release or other

COBALT 000014

such action shall be deemed to have been conditioned upon any payment of the obligations evidenced hereby having become final and irrevocable.

27. Captions. The captions or headings herein have been inserted solely for the convenience of reference and in no way define or limit the scope, intent or substance of any provision of this Note. Whenever the context requires or permits the singular shall include the plural, the plural shall include the singular and the masculine, feminine and neuter shall be freely interchangeable.

[SIGNATURE PAGE FOLLOWS]

COBALT 000015

IN WITNESS WHEREOF, Maker has caused this Note to be executed effective as of the day and the year first above written.

410 CENTRE LLC

By: _____
John B. Urbahns, Managing Member

**Received**

JUL 0 1 2008

COBALT 000016

<u>EXHIBIT "A"</u>

<u>LIBOR DESIGNATION NOTICE</u>

MAKER:  410 CENTRE LLC

LENDER:  M&I MARSHALL & ILSLEY BANK

DATE OF THIS NOTICE: _____, 200___

   Maker hereby submits this LIBOR Designation Notice pursuant to that certain Promissory Note dated May ___, 2008, executed by Maker in favor of Lender in the principal amount of Five Million One Hundred Thousand and 00/100 Dollars ($5,100,000.00) (the "Note"). This Notice is irrevocable. All capitalized terms not defined herein shall have the meanings ascribed to them in the Note.

   Maker hereby requests that the entire portion of the principal balance of the Note outstanding which is currently subject to the Prime-Based Rate begin bearing interest at the LIBOR-Based Rate commencing effective as of the first day of the calendar month following the calendar month in which this Notice is received by Lender. Maker acknowledges that once the change of the interest rate requested by this Notice becomes effective, the LIBOR-Based Rate shall apply with respect to the entire principal balance outstanding under the Note until such time as Maker submits a Prime Designation Notice with respect to any portion of the principal balance outstanding and such notice takes effect pursuant to the terms of the Note.

   This LIBOR Designation Notice is submitted by Maker as of the _____ day of _____, 200___.

       410 CENTRE LLC


       By: _____
         John B. Urbahns, Managing Member

COBALT 000017

## EXHIBIT "B"

### PRIME DESIGNATION NOTICE

MAKER:        410 CENTRE LLC

LENDER:      M&I MARSHALL & ILSLEY BANK

DATE OF THIS NOTICE: _____, 200___

     Maker hereby submits this Prime Designation Notice pursuant to that certain Promissory Note dated May ___, 2008, executed by Maker in favor of Lender in the principal amount of Five Million One Hundred Thousand and 00/100 Dollars ($5,100,000.00) (the "Note"). This Notice is irrevocable. All capitalized terms not defined herein shall have the meanings ascribed to them in the Note.

     Maker hereby requests that the entire portion of the principal balance of the Note outstanding which is currently subject to the LIBOR-Based Rate begin bearing interest at the Prime-Based Rate commencing effective as of the first day of the calendar month following the calendar month in which this Notice is received by Lender. Maker acknowledges that once the change of the interest rate requested by this Notice becomes effective, the Prime-Based Rate shall apply with respect to the entire principal balance outstanding under the Note until such time as Maker submits a LIBOR Designation Notice with respect to any portion of the principal balance outstanding and such notice takes effect pursuant to the terms of the Note.

     This LIBOR Designation Notice is submitted by Maker as of the _____ day of _____, 200___.

410 CENTRE LLC

By: _____
       John B. Urbahns, Sole Member

290930-1 (11433-0003)

COBALT 000018

## ENDORSEMENT AND ALLONGE TO PROMISSORY NOTE

PAY to the order of LSREF2 Cobalt, LLC, a Delaware limited liability company ("Assignee"), without warranty, representation or recourse of any kind (except as set forth in that certain Loan Sale Agreement dated as of September 18, 2013 by and between BMO Harris Bank National Association, as successor-by-merger to M&I Marshall & Ilsley Bank ("Assignor"), and Assignee), that certain Promissory Note dated June 13, 2008 in the original principal amount of $5,100,000.00 made by 410 Centre LLC, an Indiana limited liability company, to the order of Assignor, as amended, restated, modified, or to the extent constituting a restatement or replacement for a prior note, as applicable.

Date: September 25, 2013

BMO HARRIS BANK NATIONAL ASSOCIATION

By: _____
Name: Gary S. Kautzer
Title: Vice President

COBALT 000028

## ENDORSEMENT AND ALLONGE TO PROMISSORY NOTE

PAY to the order of LSREF2 COBALT TRUST 2013, a Delaware statutory trust ("Assignee"), without warranty, representation or recourse of any kind, that certain Promissory Note dated June 13, 2008 in the original principal amount of $5,100,000.00 made by 410 Centre LLC, an Indiana limited liability company, to the order of BMO Harris Bank National Association, as heretofore endorsed to the undersigned, and as amended, restated, modified, or to the extent constituting a restatement or replacement for a prior note, as applicable.

[SIGNATURE PAGE FOLLOWS]

Asset ID 17.1

COBALT 000029

Date: September **25**, 2013

LSREF2 COBALT, LLC,
a Delaware limited liability company

By: _____

Name:            Laura P. Skms

Title:        Assistant Vice President

COBALT 000030

## ENDORSEMENT AND ALLONGE TO PROMISSORY NOTE

PAY to the order of WELLS FARGO BANK, NATIONAL ASSOCIATION ("Assignee"), without warranty, representation or recourse of any kind (except as set forth in that certain Purchase and Repurchase Agreement and Securities Contract dated as of September 25, 2013 by and among LSREF2 COBALT, LLC and LSREF2 COBALT TRUST 2013, as sellers, and Wells Fargo Bank, National Association, as buyer); that certain Promissory Note dated June 13, 2008 in the original principal amount of $5,100,000.00 made by 410 Centre LLC, an Indiana limited liability company, to the order of BMO Harris Bank National Association, as heretofore endorsed to the undersigned, and as amended, restated, modified, or to the extent constituting a restatement or replacement for a prior note, as applicable.

[SIGNATURE PAGE FOLLOWS]

Asset ID 17.1

COBALT 000031

Date: September 25, 2013

LSREF2 COBALT TRUST 2013,
a Delaware statutory trust

By:    Hudson Americas LLC,
       its Administrator

By: _____

Name:     Laura P. Sims
Title:     Assistant Vice President

COBALT 000032

## ALLONGE TO PROMISSORY NOTE

ALLONGE to that certain Promissory Note dated June 13, 2008, as amended from time to time through the date hereof, in the stated principal amount of $5,100,000.00, made by 410 Centre LLC, an Indiana limited liability company, to the order of BMO Harris Bank National Association, as successor-by-merger to M&I Marshall & Ilsley Bank, as subsequently assigned thereby to LSREF2 Cobalt, LLC, a Delaware limited liability company, then to LSREF2 Cobalt Trust 2013, a Delaware statutory trust, and then to the undersigned ("Assignor").

Pay to the order of LSREF2 Cobalt (TX), LLC, a Delaware limited liability company, without recourse, representation or warranty, express or implied.

DATE: As of NOVEMBER 2013

**THIS ALLONGE SHOULD BE PERMANENTLY AFFIXED
TO THE PROMISSORY NOTE DESCRIBED ABOVE**

1

**COBALT 000616**

ASSIGNOR:

WELLS FARGO BANK, NATIONAL
ASSOCIATION

By: _____

Name:        Jesse Lee

Title:       Assistant Vice President

2

COBALT 000617

**TAB C**

## CONTINUING GUARANTY

THIS CONTINUING GUARANTY is made to be effective as of the _13_ day of
_____June_____, 2008, by JOHN B. URBAHNS (hereinafter referred to as
"**Guarantor**") in favor of **M&I MARSHALL & ILSLEY BANK**, its successors and assigns
(hereinafter referred to as "**Lender**").

### Recitals

A.     **410 CENTRE LLC**, an Indiana limited liability company (hereinafter referred to
as "**Borrower**"), has requested that Lender make a loan to Borrower (such loan as from time to
time modified or amended is hereinafter referred to as the "**Loan**") to be evidenced by a certain
Promissory Note executed or to be executed by Borrower in favor of Lender in the principal
amount of Five Million One Hundred Thousand and 00/100 ($5,100,000.00) (such promissory
note, and/or any promissory note which is a direct or remote modification, amendment,
restatement or replacement of such promissory note, as may be from time to time modified or
amended, is hereinafter referred to as the "**Note**");

B.     Guarantor has a direct or indirect financial interest in Borrower and its business
and will benefit directly or indirectly from the extension of the Loan to Borrower;

C.     As partial consideration for and in order to induce Lender to make the Loan,
Lender requires, inter alia, that Guarantor execute and deliver this Guaranty to Lender.

NOW THEREFORE, in consideration of these premises and other good and valuable
consideration, the receipt and sufficiency of which is hereby acknowledged, and to induce
Lender to make the Loan, Guarantor hereby agrees as follows:

1.     Guarantor hereby absolutely, unconditionally and irrevocably guarantees to
Lender, and its successors and assigns, the full, prompt and complete payment and performance
when due (whether by acceleration or otherwise, and without presentment or demand, protest,
notice of dishonor or diligence in collection) of all present and future indebtedness and
obligations of Borrower to Lender or, with respect to any Rate Management Transaction referred
to herein, to any affiliate of Lender, individually or with others, in accordance with the terms and
conditions of such indebtedness and obligations, whether direct or indirect, absolute or
contingent and whether evidenced by promissory notes, agreements, checks, drafts, letters of
credit, bills, overdrafts, open accounts or otherwise, including but not limited to the principal of,
interest on and other sums from time to time owing in connection with any present or future
indebtedness and obligations of Borrower evidenced by or arising in connection with the
following:

(a)     The Note, or any notes in renewal thereof, as from time to time renewed,
extended, amended, modified or increased;

(b)     All agreements made by Borrower to indemnify Lender (hereinafter
referred to collectively as the "**Indemnifications**") contained in a certain Deed of Trust,
Security Agreement and Assignment of Leases and Fixture Filing executed and delivered

COBALT 000328

PLAINTIFF EXHIBIT NO. 4

or to be executed and delivered by Borrower to Lender in connection with the Note (such deed of trust and/or any direct or remote agreement amending or restating such deed of trust, as may be from time to time modified or amended is hereinafter referred to as the "**Deed of Trust**") or in any other agreement executed in connection therewith, including any modifications or amendments of the Indemnifications;

(c)     Any instrument, agreement or document executed in connection with any Rate Management Transaction, as such term is defined in the Deed of Trust; and

(d)     Any and all extensions, renewals, increases, modifications, amendments, restatements and direct or remote replacements of any of the foregoing.

(all of the indebtedness, obligations and Indemnifications guaranteed hereby are hereinafter referred to collectively as the "**Indebtedness**" and the Note, the Deed of Trust and any other documents from time to time evidencing or executed in connection with all or any portion of the Indebtedness are hereinafter referred to collectively as the "**Loan Documents**"). Without limitation, Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Lender, and its successors and assigns, the full, prompt and complete performance of each and every obligation of Borrower contained in the Loan Documents.

2.     Guarantor agrees to pay to Lender, without relief from valuation and appraisement laws, all amounts payable under this Guaranty, together with the costs and expenses incurred by Lender in connection with the collection or enforcement of this Guaranty, including without implied limitation reasonable attorneys' fees incurred by Lender in connection with (i) the protection of any security for or rights arising in connection with this Guaranty, (ii) the enforcement of any provision contained in this Guaranty or in any document executed in connection herewith, or (iii) the collection of any indebtedness evidenced hereby or arising in connection herewith (including without limitation attorneys fees incurred by Lender in connection with any bankruptcy, reorganization, receivership or other proceeding affecting creditor's rights and involving a claim under this Guaranty or any document executed in connection herewith). In addition, Guarantor agrees to pay to Lender all reasonable attorneys' fees incurred by Lender in connection with any advice or other representation with respect to any default by Borrower under the Loan Documents or any default by Guarantor under this Guaranty, regardless of whether any formal collection efforts are undertaken by Lender.

3.     All amounts payable under or with respect to this Guaranty shall be payable without relief from valuation and appraisement laws. All payments by Guarantor to Lender shall be paid in lawful money of the United States of America.

4.     The obligations of Guarantor hereunder are primary, absolute, independent, irrevocable and unconditional. This Guaranty is an absolute, present and continuing guaranty of payment and not of collection. Lender may proceed directly against Guarantor without exercising and/or exhausting any right or remedy against (a) any collateral which is security for the Indebtedness or (b) Borrower or any other guarantor or other party primarily or secondarily liable for the payment of the Indebtedness.

COBALT 000329

5. In addition to the obligation of Guarantor to pay and perform when due all Indebtedness, upon the written demand of Lender after the occurrence of any of the following events, Guarantor shall immediately pay in full and satisfy all of the Indebtedness remaining unpaid or unsatisfied at such time, whether or not such Indebtedness may then be due and payable, together with the costs and expenses (including without implied limitation reasonable attorneys' fees) incurred by Lender in connection with the collection or enforcement of this Guaranty, without relief from valuation and appraisement laws:

(a) The dissolution, liquidation or termination of the business of Borrower;

(b) The assignment by Borrower for the benefit of its creditors;

(c) The appointment of a receiver or a trustee for Borrower or any of its assets;

(d) The filing of an involuntary petition to adjudicate Borrower as bankrupt and the failure of Borrower to obtain a dismissal of such petition within sixty (60) days; or

(e) The filing by Borrower of a voluntary petition to adjudicate Borrower as bankrupt or for reorganization.

6. Lender may, without demand or notice of any kind, at any time when any Indebtedness shall be due and payable hereunder by Guarantor, (i) apply toward the payment of any such amount, in such manner of application as Lender may choose, any funds of Guarantor on deposit with or in the possession of Lender and (ii) exercise any other rights of set-off against Guarantor.

7. Lender may from time to time without notice to or the consent of Guarantor release, compromise, extend, increase or otherwise modify or amend any liability of Borrower or the terms of any agreement, document or instrument evidencing the Indebtedness or executed in connection with the Indebtedness. The obligations of Guarantor under this Guaranty shall be absolute and unconditional under any and all circumstances (including, but without limitation, any event, occurrence or circumstance, whether or not within the contemplation of the parties hereto and whether or not affecting the purposes of or any consideration to the Guarantor in entering into this Guaranty) and shall remain in full force and effect until (i) all credit arrangements extended by Lender to Borrower have been terminated in writing and (ii) the Indebtedness has been paid in full. Notwithstanding anything expressed or implied herein to the contrary or any action or inaction taken by Lender with respect to the Indebtedness or any documents executed in connection therewith, the obligations of Guarantor with respect to the Indemnifications shall remain in full force and effect for as long as Borrower's obligations with respect to the Indemnifications shall remain in effect.

8. The obligations of Guarantor shall not be affected, modified or impaired upon the happening from time to time of any event, including but without limitation any of the following, whether or not with notice to, or the consent of, Guarantor (notice of and consent to each of the following is hereby expressly waived by Guarantor):

COBALT 000330

(a)     The waiver, surrender, compromise, alteration, settlement, discharge, release or termination of any or all of the obligations, covenants or agreements of Borrower except for the payment and performance of the Indebtedness in full;

(b)     The failure to give notice to Borrower or Guarantor of the occurrence of an event of default under the terms and provisions of this Guaranty or any of the Loan Documents;

(c)     The extension or renewal of time for payment of any of the Indebtedness or any amount due under this Guaranty or of the time for performance of any other obligation, covenant or agreement under or arising out of this Guaranty or any of the Loan Documents;

(d)     The rescission, waiver, modification or amendment (whether material or otherwise) of any obligation, covenant or agreement set forth in this Guaranty or any of the Loan Documents or any other act or thing or omission or delay to do any other act or thing which may in any manner or to any extent vary the risk of Guarantor or would otherwise operate as a discharge of Guarantor as a matter of law;

(e)     The taking, suffering or omitting to take any of the actions referred to or permitted to be taken by Lender in this Guaranty or in any of the Loan Documents;

(f)     The failure, omission, delay or lack of diligence on the part of Lender to enforce, assert or exercise any right, power or remedy conferred on Lender under this Guaranty or any of the Loan Documents;

(g)     The voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all of the assets, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, reorganization, arrangement, composition with creditors or readjustment of, or any similar proceedings affecting, Borrower or the allegation or contest of the validity of this Guaranty or any of the Loan Documents;

(h)     The release or discharge of Borrower from the performance or observance of any obligation, covenant or agreement contained in any of the Loan Documents;

(i)     Any event or action that would result in the release or discharge of Guarantor from the performance or observance of any obligation, covenant or agreement contained in this Guaranty;

(j)     The default or failure of Guarantor fully to perform the obligations of Guarantor set forth in this Guaranty;

(k)     The invalidity, illegality or unenforceability of any of the Loan Documents or any part thereof;

(l)     The waiver, surrender, compromise, alteration, settlement, discharge, release or termination of any or all of the obligations, covenants or agreements of any other guarantor or other party primarily or secondarily liable for the payment of the

COBALT 000331

Indebtedness;

(m)  The consent by Lender of (i) the assignment, conveyance or transfer by Borrower of any collateral which is security for the Indebtedness or (ii) the granting of a second mortgage lien, security interest or collateral assignment in any of the collateral securing the Indebtedness to third parties; or

(n)  Any other cause similar or dissimilar to any of the foregoing.

9.  Guarantor acknowledges that Guarantor has had an opportunity to review the Loan Documents and all other documentation and information which Guarantor feels is necessary or appropriate in order to execute and deliver this Guaranty to Lender. Guarantor warrants and represents to Lender that Guarantor has knowledge of Borrower's financial condition and affairs and of all other circumstances which bear upon the risk assumed by Guarantor under this Guaranty. Guarantor agrees to continue to keep informed thereof while this Guaranty is in force and further agrees that Lender does not have and will not have any obligation to investigate the financial condition or affairs of Borrower for the benefit of Guarantor or to advise Guarantor of any fact respecting, or any change in, the financial condition or affairs of Borrower or any other circumstance which may bear upon Guarantor's risk hereunder which comes to the knowledge of Lender, its directors, officers, employees or agents at any time, whether or not Lender knows, believes or has reason to know or to believe that any such fact or change is unknown to Guarantor or might or does materially increase the risk of Guarantor hereunder.

10.  Guarantor hereby ratifies all representations and warranties made by Borrower with respect to Guarantor and agrees to be bound by all covenants, agreements and releases made by Borrower with respect to Guarantor.

11.  Guarantor hereby waives each of the following:

(a)  Notice of (i) the acceptance of this Guaranty, (ii) the existence or creation of all or any of the Indebtedness, (iii) any extension of credit, advancement, readvancement, loan or similar accommodation by Lender to Borrower, and (iv) the amount of the Indebtedness which may exist from time to time;

(b)  Any and all presentment for payment, demand for payment, protest and notice of protest, notice of dishonor or nonpayment, notice of nonperformance or other notice of default with respect to any of the Indebtedness and any and all other formalities which might be necessary for the enforcement of this Guaranty;

(c)  Any claim, right or remedy which Guarantor may now have or hereafter acquire against Borrower that arises hereunder and/or from the performance by Guarantor hereunder including, without limitation, any claim, remedy or right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim, right or remedy of Lender against Borrower or any security which Lender now has or hereafter acquires, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law, or otherwise;

COBALT 000332

(d)     Any and all defenses based on suretyship or impairment of collateral;

(e)     Any and all rights Guarantor may have under any anti-deficiency statute or other similar protections;

(f)     To the extent permitted by law, any and all rights and defenses Guarantor may have under I.C. 34-22-1-1, et seq.;

(g)     All diligence in collection or protection of or realization upon (i) the Indebtedness or any part thereof, (ii) any obligation hereunder, and (iii) any collateral securing the Indebtedness; and

(h)     Any rights arising by reason of the incapacity, lack of authority, death or disability of any other guarantor of the Indebtedness or any failure by Lender to file or enforce a claim against the estate of any other guarantor.

12.     Pursuant to the provisions of I.C. 26-1-3.1-605(i), Guarantor hereby waives any right of discharge of this Guaranty arising under any defense based upon suretyship or impairment of collateral or any other right of discharge set forth under the provisions of I.C. 26-1-3.1-605.

13.     Guarantor hereby releases and discharges Lender from all claims, liabilities, demands, damages and causes of actions which Guarantor might now or hereafter assert or claim against Lender arising out of, relating to, or in any way connected with the conditions for, or the negotiation, execution or delivery of, this Guaranty.

14.     In the event any judgment is obtained against Borrower with respect to the Indebtedness and a deficiency remains after the application of any collateral securing the Indebtedness, Guarantor agrees to waive any anti-deficiency statute or other similar protections which may exist under applicable law and hereby promises to pay to Lender upon demand the amount of any such deficiency, provided however, nothing contained herein shall be construed to require that Lender exercise and/or exhaust any right or remedy against (a) any collateral which is security for the Indebtedness or (b) Borrower or any other guarantor or other party primarily or secondarily liable for the payment of the Indebtedness.

15.     Guarantor agrees that for purposes of this Guaranty, any indebtedness and obligations which Borrower may have to any subsidiary or affiliate of Lender in connection with any Rate Management Transaction shall be deemed to be indebtedness and obligations owed directly to Lender and the payment and performance when due shall be guaranteed by this Guaranty and may be collected and recovered by Lender in any action to enforce this Guaranty as if such indebtedness and obligations were directly owed to Lender.

16.     Guarantor shall have no right of contribution with respect to any other guarantor unless and until Lender shall have received payment in full of all of the Indebtedness. Guarantor shall not pursue collection of any indebtedness of Borrower to Guarantor or exercise any right or remedy with respect to any security therefor unless and until Lender shall have received payment in full of all of the Indebtedness.

COBALT 000333

17. Guarantor agrees (i) to give prompt written notice to Lender of any material adverse change in the financial condition of Guarantor, financial or otherwise, (ii) as soon as available and in any event within ninety (90) days after the end of each calendar year, to provide Lender with a financial statement for Guarantor in the form requested by Lender, (iii) as soon as available and in any event within ninety (90) days after the end of each calendar year, to provide Lender with a copy of the federal income tax return for Guarantor for the calendar year then ended, and (iv) to furnish or cause to be furnished to Lender, at such times as may be required under the Loan Documents, all other financial statements and information concerning Guarantor which Borrower may be required to furnish to Lender pursuant to the terms of any of the Loan Documents. Guarantor represents, warrants and covenants to Lender that (i) the financial statements of Guarantor heretofore delivered to Lender are true and correct in all material respects and fairly present the financial condition of Guarantor, (ii) there has been no material adverse change in the financial condition of Guarantor since the date of such statements, and (iii) Guarantor will not cause or permit any of Guarantor's property, business or assets to be sold, terminated, assigned, leased, conveyed, pledged or otherwise transferred or encumbered without fair and adequate consideration so long as any Indebtedness remains unpaid.

18. If any demand is made at any time upon Lender for the repayment or recovery of any amount or amounts received by Lender in payment or on account of any of the Indebtedness and Lender repays all or any part of such amount or amounts by reason of any judgment, decree or order of any court or administrative body or by reason of any settlement or compromise of any such demand, Guarantor will be and remain liable hereunder for the amount or amounts so repaid or recovered to the same extent as if such amount or amounts had never been received originally by Lender.

19. Guarantor hereby subordinates the payment of any and all indebtedness of Borrower now or hereafter owed to Guarantor to the payment in full of all Indebtedness, and agrees with Lender that after the occurrence of an event of default under any of the Loan Documents, Guarantor shall not demand or accept any payment of principal or interest from Borrower, shall not claim any offset or other reduction of Guarantor's obligations hereunder because of any such indebtedness, and shall not take any action to obtain any of the security described in and encumbered by any instrument securing the Indebtedness; provided, however, that if Lender so requests, such indebtedness of Borrower to Guarantor shall be collected, enforced and received by Guarantor as trustee for Lender and be paid over to Lender on account of the Indebtedness, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.

20. Guarantor acknowledges and agrees that (i) there may be from time to time additional guarantors of the Indebtedness, (ii) each such additional guarantor may execute a separate guaranty in connection with such guarantor's guarantee of the Indebtedness, (iii) each such separate guaranty may contain different terms and provisions than the terms and provisions set forth in this Guaranty and (iv) each such separate guaranty may guarantee more indebtedness and obligations (or less indebtedness and fewer obligations) of Borrower to Lender than the indebtedness and obligations of Borrower to Lender which are guaranteed under this Guaranty. Guarantor further acknowledges and agrees that the existence of any such additional guarantor and separate guaranty shall not affect the indebtedness and obligations of Guarantor under this Guaranty. Furthermore, in the event any such additional guarantor is also the spouse of

COBALT 000334

Guarantor, then Guarantor acknowledges and agrees that Guarantor and Guarantor's spouse shall be jointly and severally liable for and to the extent of all indebtedness and obligations which are guaranteed both hereunder and under such separate guaranty [all of the indebtedness and obligations of Guarantor arising hereunder shall automatically be deemed to be joint and several with any indebtedness and obligations which the spouse of Guarantor may have under such spouse's separate guaranty].

21.     Guarantor acknowledges that (i) the terms and conditions of the Loan Documents may include a future advancement and/or a revolving feature, (ii) the principal balance of the Indebtedness from time to time outstanding may be reduced to zero dollars ($0.00) and (iii) Lender may make periodic advancements and readvancements of the Indebtedness as provided for in the Loan Documents. Guarantor confirms and agrees that this Guaranty shall be effective with respect to all advancements and readvancements of the Indebtedness.

22.     Guarantor agrees that all actions or proceedings arising directly, indirectly or otherwise in connection with, out of, related to or from this Guaranty shall be litigated, at Lender's sole discretion or election, in either (i) a court having situs within the State of Indiana, the state of Lender's principal place of business or (ii) a court having situs within the State of Arizona where the real estate encumbered by the Deed of Trust is located. Guarantor hereby consents and submits to the jurisdiction of any local, state or federal court located within either of the two (2) states listed above. Notwithstanding anything contained in this paragraph to the contrary, Lender shall have the right to commence and litigate any action or proceeding against Guarantor or any property of Guarantor in any court of any other appropriate jurisdiction.

23.     Guarantor and Lender, by acceptance of this Guaranty, hereby agree that any suit, action or proceeding, whether a claim or counterclaim, brought or instituted by any party on or with respect to this Guaranty or any other document executed in connection herewith or which in any way relates, directly or indirectly to the Indebtedness or any event, transaction or occurrence arising out of or in any way connect with this Guaranty or the dealings of the parties with respect hereto, shall be tried only by a court and not by a jury. **GUARANTOR AND LENDER, BY ACCEPTANCE OF THIS GUARANTY, HEREBY EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION OR PROCEEDING.** Guarantor acknowledges that Guarantor may have a right to a trial by jury in any such suit, action or proceeding and that Guarantor hereby is knowingly, intentionally and voluntarily waiving any such right. Guarantor further acknowledges and agrees that this paragraph is material to this Guaranty and that adequate consideration has been given by Lender and received by Guarantor in exchange for the waiver made by Guarantor pursuant to this paragraph.

24.     Any written notice permitted or required hereunder shall be effective when (a) mailed by certified United States mail, postage prepaid with return receipt requested, or (b) sent by an overnight carrier which provides for a return receipt, to the applicable address specified below:

COBALT 000335

| If to Guarantor: | John B. Urbahns |
| | 7914 North Shadeland Avenue |
| | Suite 200 |
| | Indianapolis, Indiana 46250 |
| | |
| If to Lender: | M&I Marshall & Ilsley Bank |
| | 135 North Pennsylvania Street |
| | Indianapolis, Indiana 46204 |
| | Attention: Russell R. Swan, Senior Vice President |

or at such other address within the State of Indiana as Guarantor or Lender may from time to time specify for itself by notice hereunder. Any notice may be given on behalf of Lender or Guarantor by such party's legal counsel.

25. Guarantor hereby acknowledges that the execution and delivery of this Guaranty by Guarantor is a condition precedent to the extension of the Indebtedness to Borrower by Lender. Guarantor hereby acknowledges, certifies, warrants and represents to Lender that

(a) Guarantor has a direct or indirect financial interest in Borrower and its business and will benefit directly or indirectly from the extension of the Indebtedness to Borrower, and

(b) Guarantor has received valuable, sufficient and reasonably equivalent consideration for the execution and delivery to Lender of this Guaranty.

Guarantor hereby agrees to indemnify, protect and hold Lender, and any successors or assigns of Lender, harmless from and against any and all losses, costs, liabilities, damages, injuries and expenses, including without limitation reasonable attorneys' fees and disbursements, which Lender may incur by reason of the inaccuracy or breach of any of the foregoing representations and warranties as of the effective date hereof.

26. This Guaranty shall be binding upon Guarantor and Guarantor's respective heirs, beneficiaries, successors, assigns and legal representatives and shall inure to the benefit of Lender and its successors, assigns and legal representatives.

27. This Guaranty is executed and shall be construed in accordance with the laws of the State of Indiana, notwithstanding that Indiana conflicts of law rules might otherwise require the substantive rules of law of another jurisdiction to apply. If any provision (or portion thereof) of this Guaranty or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, then the remainder of this Guaranty or the application of such provision (or portion thereof) to any other person or circumstance shall be valid and enforceable to the fullest extent permitted by law. Whenever the context requires or permits the singular shall include the plural, the plural shall include the singular and the masculine, feminine and neuter shall be freely interchangeable.

COBALT 000336

IN WITNESS WHEREOF, Guarantor has executed this Guaranty to be effective as of the date first above written.

_____
John B. Urbahns

STATE OF INDIANA      )
                      ) SS:
COUNTY OF MARION      )

Before me, a Notary Public in and for said County and State, personally appeared John B. Urbahns, who, after having been duly sworn, acknowledged the execution of the foregoing Continuing Guaranty.

WITNESS my hand and Notarial Seal this 27ᵗʰ day of May , 2008.

*Mary Beth Robbins*
Notary Public

[Notary Seal:]
MARY BETH ROBBINS
Hamilton County
My Commission Expires
July 19, 2014

My Commission Expires:                    My County of Residence:

_____                   _____

291057-2 (11433-0003)

COBALT 000337

**TAB D**



ORIGINAL

6080110916-56564

## FORBEARANCE AGREEMENT

THIS FORBEARANCE AGREEMENT ("Agreement") is made as of the 30th day of September, 2011 with an effective date of September 30, 2011 ("Effective Date") by and between 410 CENTRE LLC ("Borrower"), JOHN B. URBAHNS ("Guarantor") and BMO HARRIS BANK N.A., as successor-by-merger to M&I Marshall & Ilsley Bank ("Lender"), who now agree as follows:

### RECITALS

A.      Borrower and Lender entered into a certain Loan Agreement dated June 13, 2008, as modified and amended by a certain Confirmation and Amendment of Loan Documents dated effective as of June 30, 2010, and a certain Confirmation and Amendment of Loan Documents dated effective as of June 30, 2011 executed by and between Lender and Borrower (hereinafter referred to as the "Loan Agreement"), pursuant to which Lender, among other things, extended to Borrower a loan in the principal amount of Five Million One Hundred Thousand and 00/100 Dollars ($5,100,000.00) (such loan is referred to in the Loan Agreement and is hereinafter referred to as the "Loan").

B.      The Loan is evidenced by a certain Promissory Note dated June 13, 2008, executed by Borrower in favor of Lender in the principal amount of Five Million One Hundred Thousand and 00/100 Dollars ($5,100,000.00) as modified and amended by a certain Confirmation and Amendment of Loan Documents dated effective as of June 30, 2010 and a certain Confirmation and Amendment of Loan Documents dated effective as of June 30, 2011 by and between Lender and borrower (such promissory note is hereinafter referred to as the "Note").

C.      The Loan, and any extensions, renewals, replacements, increases and modifications thereof, are secured by, among other things, (a) a certain Deed of Trust Security Agreement and Assignment of Leases and Fixture Filing dated June 13, 2008, executed by Borrower in favor of Lender, as beneficiary, and SCOTT K. McDONALD, as Trustee, which was filed for record on June 13, 2008 in the Official Records of the County Clerk of Bexar County, Texas, under Instrument File Number 20080125701, Book 13542, Page 407 (hereinafter referred to as the "Deed of Trust"), (b) a certain Assignment of Leases and Rents dated June 13, 2008, executed and delivered by Borrower in favor of Lender, which was filed for record on June 13, 2008 in the Official Records of the County Clerk of Bexar County, Texas, under Instrument File Number 20080125702, Book 13542, Page 445 (such assignment is referred to in the Loan Agreement and hereinafter referred to as the "Lease Assignment"), (c) a certain Assignment of Construction Contracts dated June 13, 2008, executed and delivered by Borrower in favor of Lender (such assignment is referred to in the Loan Agreement and hereinafter referred to as the "Contract Assignment"), and (d) other security.

D.      The Guarantor has executed and delivered to the Lender his continuing Guaranty dated June 13, 2008.

E.      The Loan matures on September 30, 2011. The Borrower has informed the Lender that it is unable to pay the Loan on the maturity date. As a result of the non-payment at maturity

4817744_2 - 1/24/2012/11:31 AM/db

COBALT 000447

PLAINTIFF EXHIBIT NO. 7

("**Existing Default**"), Lender is lawfully entitled to exercise any and all of its rights, powers and remedies under the Loan Documents.

F.       Borrower and Guarantor ("**Credit Parties**") have requested that the Lender refrain from exercising its rights, powers and remedies.

G.       Subject to its right to terminate this Agreement as set forth herein, the Lender is willing to forbear upon the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the Recitals, the mutual covenants and agreements contained herein and the acts to be performed hereunder, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of the parties, the parties agree as follows:

1.       **Definitions.** Capitalized terms used herein unless otherwise specifically defined herein shall have the respective meanings ascribed to them in the Loan Documents.

2.       **Recitals.** Each of the Credit Parties acknowledges the accuracy of the Recitals. The Recitals are incorporated herein and made a part hereof.

3.       **Acknowledgement of Default and Existing Indebtedness.** Each of the Credit Parties acknowledges that on the Effective Date Borrower is in default under the terms of the Loan Documents and that Lender is entitled to exercise all of its rights, powers, and remedies thereunder.

4.       **Reaffirmation of Existing Documents-No Defenses.** Each of the Credit Parties reaffirms all of the provisions of the Loan Documents, which Loan Documents are expressly incorporated herein by reference. The Loan Documents are valid, binding and enforceable, as applicable, in accordance with their respective terms, and each of the Credit Parties has no defenses, set-offs, claims, counterclaims, affirmative defenses, or causes of action of any kind or nature with respect to any of the Loan Documents or the Indebtedness represented thereby. The liens and security interests of Lender on the assets of the Borrower identified in the Loan Documents remain valid and in full force and effect, and are prior to the liens and security interests, if any, consensually granted to or obtained by third parties on any such asset, except as previously disclosed to Lender. The Loan Documents shall remain in full force and effect, shall be modified only as expressly provided herein, and except as set forth herein, nothing contained herein shall be deemed to be a waiver by Lender of the Existing Default or any provision contained in the Loan Documents. This Agreement does not supersede the Loan Documents; however, in the event of any conflict between this Agreement and the Loan Documents, this Agreement shall control. The Indebtedness is not impaired or cancelled by this Agreement and Borrower remains obligated to pay the Indebtedness in full as provided by the Loan Documents except as expressly modified herein.

5.       **Agreement to Forbear—Extent of Forbearance.** Subject to the Borrower's complete and timely compliance with the terms of this Agreement, Lender agrees to forbear and

2

68177744_2 - 1/24/2012/11:21 AM/deb

COBALT 000448

refrain during the Forbearance Period from initiating or prosecuting any legal action in any court to collect the Indebtedness (referred to herein as **"Collection Action"**). As used in this Agreement, the term **"Collection Action"** relates solely to judicial actions by Lender to attempt to collect the Indebtedness, such as the initiation of suit on the Note or other agreements evidencing the Indebtedness, or the initiation of judicial foreclosure. The term "Collection Action" does not include, and the forbearance provided in this Paragraph 5 does not extend to, any action which Lender may take to preserve, perfect, protect or otherwise act with respect to the liens and security interests held by Lender with respect to the collateral. As used in this Agreement, the term **"Forbearance Period"** shall mean that period which commences on the Effective Date of this Agreement and ends on the date that is the earlier of the date on which any Termination Event occurs, or September 30, 2013.

6.    Monthly Payments of Principal and Interest – Auto Debit.  Accrued and unpaid interest shall be payable commencing on the first day of the first calendar month following the Effective Date and continuing on the first day of each calendar month thereafter until the Note is paid in full.  Borrower authorizes Lender to automatically debit each monthly payment and in implementation thereof, the Borrower and the Lender shall on the Effective Date establish an auto-debit arrangement for each monthly interest payment. Interest shall accrue at the non-default rate of the Prime Rate plus one percent (1.00%) with no floor. If not otherwise accelerated the entire unpaid principal balance and all accrued interest shall be due and payable on September 30, 2013. The Note is hereby modified as set forth herein. Except as so modified all other terms and conditions of the Note remain in full force and effect.

7.    Subordinated Note – Tenant Improvements.  On the Effective Date, the Guarantor will cause a junior secured lender (acceptable to the Lender) to lend to the Borrower on a fully subordinated basis up to Six Hundred Thousand and 00/100 Dollars ($600,000.00) for the purpose of funding the ITT and other tenant improvements. The subordinated debt will be for a period of not less than two (2) years from the Effective Date at an interest rate of no more than seven percent (7%) per annum. The Borrower shall be permitted to make principal and interest payments on the junior debt only from excess cash flow over and above the 1.00 to 1.00 Debt Service Charge Ratio Financial Covenant established in paragraph 12 herein until the senior debt is repaid. The Lender will not fund any tenant improvements on the Project or tenant build-outs during the Forbearance Period.

8.    Rents – Cash Collateral Account.  During the Forbearance Period, all rents and other revenues associated with the operation of the Project shall be directed to the Lender for deposit into a Cash Collateral Account established by Lender for the purpose of giving Lender control over all revenues. In implementation thereof, Lender may at its option notify the tenants to make payments directly to the Lender. Lender shall release funds as needed to pay for approved operating expenses and, subject to the terms of this Agreement, principal and interest payments on the junior debt.

9.    Lease of the Project.  No later than the Effective Date, Borrower shall retain a real estate broker, acceptable to Lender, to actively and aggressively market the Project for lease. Borrower shall direct and cause the broker to send written updates describing its lease efforts at least monthly during the Forbearance Period. Lender shall have complete access to all information, and ability to communicate with all parties related to the lease efforts and to any

3

68177144_2 - 1/24/2012/11:31 AM/dxb

COBALT 000449

offer to purchase the Project, except that Lender shall not communicate directly with prospective tenants without Borrower's written consent.

10.    **Leases and Contracts.** Borrower shall furnish Lender with (i) copies of all leases and (ii) copies of all contracts in excess of Five Thousand and 00/100 Dollars ($5,000.00) within fifteen (15) days following execution.

11.    **No Liens, Construction or Otherwise.** Borrower will keep the Project free and clear of all liens and encumbrances other than the Lender's lien and the subordinated creditor's lien. At the Borrower's expense (which Borrower shall pay immediately upon request by Lender), Lender may at its option obtain monthly title and lien searches during the Forbearance Period to confirm the non-existence of non-permitted liens.

12.    **Minimum Debt Service Coverage Ratio.** The Borrower will have a Debt Service Coverage Ratio of not less than 1.00 to 1.00 on an interest only basis tested in arrears on a quarterly basis starting March 31, 2012 and quarterly thereafter.

13.    **ITT Occupancy** . . The ITT shall occupy its leased space in the Project no later than February 14, 2012.

14.    **Real Estate Taxes.** Borrower warrants and represents that on the Effective Date all real estate taxes relating to the Project are current and paid. During the Forbearance Period Borrower shall pay all real estate taxes on or before the due date. Borrower shall provide Lender with evidence of such payments in the form of paid receipts within ten (10) days of payment.

15.    **Insurance.** On the Effective Date, Borrower shall furnish Lender with evidence that sufficient property insurance is in place and shall furnish evidence that such insurance has been extended no later than thirty (30) days prior to any termination date(s).

16.    **Forbearance Conditions.** To induce Lender to enter into this Agreement, Borrower agrees to the following:

(a)    **Payments.** Borrower shall make all payments as required herein and under the Loan Documents on a timely basis.

(b)    **Default.** Borrower shall not permit or cause to occur any Event of Default, other than the Existing Default, as defined under the terms and provisions of the Loan Documents.

(c)    **No avoidable transfers.** Borrower shall not make any "transfer" (as such term is defined in the Bankruptcy Code, as hereinafter defined) which would constitute an avoidable transfer under §547 or §548 of the United States Bankruptcy Code, as amended (11 U.S.C. §101 *et seq.*, hereinafter the "Bankruptcy Code") if Borrower were to become a debtor (within the meaning of the Bankruptcy Code) within ninety (90) days of the date of such transfer. For purposes of clarity hereunder, a "transfer" prohibited hereunder shall not include a transfer to the extent that the transfer is a contemporaneous exchange for new value given to Borrower or is intended to be such a contemporaneous transfer, a transfer made in the ordinary course of Borrower's business made according to

4

08177744_2 - 1/24/2012/1 1:31 AM/dsh

COBALT 000450

customary business terms, and in the good faith judgment of Borrower, is a transfer made in the ordinary course of Borrower's business according to customary business terms, notwithstanding that a Bankruptcy Court may rule otherwise.

(d) Notice of Litigation. Borrower shall promptly notify Lender of the commencement of any litigation against Borrower or the commencement of an involuntary case against or by Borrower under Chapters 7 or 11 of the Bankruptcy Code.

(e) Comply with Loan Documents. Borrower shall fully and completely comply with any and all terms of the Loan Documents other than as specifically modified herein.

(f) Collateral. The Loan shall continue to be secured by the presently existing Loan Documents and all presently existing Collateral.

(g) Depository Accounts. Borrower shall maintain its depository accounts at the Lender.

(h) Comply with this Agreement. Borrower shall fully and completely comply with any and all terms of this Agreement.

(i) Reports. In addition to the reports currently required by the Loan Documents, Borrower shall furnish Lender with a quarterly rent roll and operating statement within thirty (30) days following the end of each quarter.

17. Termination Events. Upon the occurrence of a Termination Event, the Lender may, at its option, terminate the Forbearance Period and pursue all of its rights, powers and remedies under the Loan Documents. As used in this Agreement, the term "Termination Event" shall mean the occurrence of any one of the following:

(a) Borrower shall become the subject of a voluntary case under the Bankruptcy Code or the subject of an involuntary case under the Bankruptcy Code that is not dismissed within sixty (60) days after institution thereof, or otherwise shall become the subject of an order for relief under the Bankruptcy Code.

(b) Borrower shall breach or fail to perform any of its covenants, obligations, or agreements contained in this Agreement.

(c) Borrower shall prepay any obligations for borrowed money owed to any party other than Lender.

(d) Any representation or warranty of Borrower contained in this Agreement shall be or become untrue or inaccurate in any material respect.

(e) A receiver shall be appointed with respect to any of the assets or properties of Borrower.

5

6817744_2 - 1/24/2012/11:31 AM/dsb

COBALT 000451

(f) A creditor of Borrower shall take any action to enforce by repossession, foreclosure, or other legal proceeding, any lien or security interest against any asset of Borrower.

(g) A sale, transfer, conveyance or other disposition of any of the assets of Borrower shall occur without the prior written consent of Lender, excepting only inventory sold in the ordinary course of business.

(h) An action, litigation or proceeding shall be brought against Borrower in any court or before or by any agency or regulatory body which could materially and adversely affect the financial condition of Borrower, or which results in a final, non-appealable judgment not covered by insurance against Borrower in an amount in excess of Ten Thousand and 00/100 Dollars ($10,000).

(i) Borrower shall fail to pay when due, or within ten (10) days thereof, any amount payable under this Agreement.

(j) There shall occur an Event of Default under the Loan Documents other than the Existing Default.

(k) There shall occur an event of default under the junior subordinated debt.

(l) The junior lienholders shall refuse to release their lien upon request of the Borrower or the Lender in the event of a sale of the Project.

18. Fee. Borrower shall pay to Lender on the Effective Date a forbearance fee of Seven Thousand and 00/100 Dollars ($7,000.00).

19. Consent to Appointment of Receiver with Authority to Sell the Project. Borrower reaffirms its consent to the appointment of a receiver as set forth in the Deed of Trust if there is a Termination Event during the Forbearance Period or thereafter. In addition, as a material bargained for consideration and inducement to the Lender to forbear from exercising its rights and remedies as a result of the Existing Default, Borrower hereby waives any right of redemption that may exist in its favor, and explicitly consents to the pre-judgment sale of the Project and the business operated from the Project (together with all other collateral associated with the Project) by a receiver; provided, however, that Borrower shall be given notice of any possible prejudgment sale, and shall continue to have standing and reserves the right to be heard on and object to the specific circumstances of and procedures associated with any such sale or the purchase price (but not the concept of such sale). The provisions of this Section 19 shall survive and remain effective following the Forbearance Period.

20. Further Agreements/No Course of Dealing Established/ No Further Obligation To Extend Credit. Borrower hereby acknowledges and agrees that:

(a) This Agreement does not constitute, and no agreement, compromise or settlement of any kind has been reached between Lender and Borrower regarding, a reinstatement, restructuring or modification of the Indebtedness or any portion thereof or of any of the Loan Documents, and no such agreement shall exist or be deemed to exist

6

COBALT 000452

unless and until all parties thereto execute and deliver complete documentation setting forth the terms of any such reinstatement, restructuring or modification;

(b)    Other than as set forth herein, Lender is not obligated to reach any agreement concerning the reinstatement, restructure or modification of the Indebtedness or any of the Loan Documents;

(c)    Neither this Agreement, nor any action taken or forbearance by Lender pursuant to this Agreement, shall impair, prejudice, or in any other manner affect the rights of Lender in and to any of the collateral (including, without limitation, any proceeds thereof) or establish or be deemed to establish any precedent or course of dealing with respect to any of the Indebtedness or collateral;

(d)    Except as set forth herein, Lender has no obligation to make any loans or extend any further credit to Borrower pursuant to the Loan Documents or otherwise.

21.    Release of Lender.  Borrower and each of the Credit Parties hereby forever release and discharge Lender, its predecessors-in-interest, parent company, affiliates, subsidiaries, and all officers, directors, employees, attorneys and other agents of any of them (collectively, the "Released Parties"), from, and hereby forever relinquish and waive, any and all debts, demands, claims, defenses, liability, suits, proceedings, expenses, actions, affirmative defenses and causes of action whatsoever of every kind, name and nature, known and unknown, whether or not founded in fact or in law, and whether in law or in equity or otherwise, now or previously existing or hereafter arising in any manner whatsoever (collectively, the "Claims") from, in connection with, or with respect to, any loan to Borrower, any collateral granted to Lender to secure any obligation of the Borrower to Lender, any negotiations between Lender and the Borrower with respect to any of the foregoing or any other matter involving Borrower, the disposition of any collateral securing any of the Indebtedness of the Borrower to Lender, and any other act, action, decision, inaction, refusal to act, forbearance or omission of Lender or any officer, director, employee, attorney or other agent of Lender, from the beginning of time to the moment of the execution of this Agreement.

Without in any manner limiting the scope of the release contained in this section, Borrower and each of the Credit Parties expressly agree that they have consulted, or had any opportunity to consult, with legal counsel with respect to this Agreement, understand that this Agreement is a release of the broadest possible nature and results in the release of those claims known and unknown to the parties. Furthermore, Borrower and each of the Credit Parties agree that the release hereby given is given in each and every capacity which the party holds and releases not only those claims which the party might have brought directly prior to the execution of this Agreement but also those claims which may have been brought indirectly or derivatively by any party to this Agreement. The Borrower and each of the Credit Parties shall be deemed to have released, relinquished, waived and discharged each and every claim any of them may have whether now existing or hereafter arising to the fullest extent possible.

22.    Notices.  For the purposes of this Agreement, notices to be given, if any, shall be deemed adequate when transmitted in accordance with the terms of the Loan Documents to:

7

6817744_2 - 1/24/2012/11:31 AM/dsb

COBALT 000453

Borrower at:                              Lender at:
410 CENTRE LLC                            BMO HARRIS BANK N.A.
7914 N. Shadeland Avenue, Suite 200       135 N. Pennsylvania Street
Indianapolis, IN  46250                   Indianapolis, IN   46204
Attn: John Urbahns                        Attn: Jim D. Gray Jr.

23.    Costs and Expenses. In addition to its obligations to reimburse Lender under the Loan Documents, Borrower agrees to pay or reimburse Lender, within five (5) business days following Lender's request, for all reasonable out of pocket costs and expenses of Lender including but not limited to attorney fees in negotiation and preparation of this Agreement, title work and appraisal costs.

24.    Survival/No Third Party Beneficiaries.    All of the acknowledgments, representations, warranties, covenants and agreements of Borrower shall survive and continue in full force and effect notwithstanding the occurrence of a Termination Event. There are no third party beneficiaries of or to this Agreement.

25.    Counterparts. This Agreement may be executed in counterparts, each of which taken together shall constitute one and the same instrument.

26.    Miscellaneous.  Except as otherwise provided in the Loan Documents as to Applicable Law, this Agreement shall be governed by and construed in accordance with the internal laws of the State of Indiana, without reference to any choice or conflict of laws provisions thereof. Borrower acknowledges that the relationship between Borrower and Lender is strictly that of "debtor/creditor", and that this Agreement shall not be construed as creating a partnership, joint venture or co-venture between them. Borrower acknowledges and agrees that Lender is not a fiduciary with respect to it, or the creditors or members of Borrower.  This Agreement may not be modified or amended except in writing signed by Borrower and Lender.

27.    Authority. The undersigned persons executing this Agreement on behalf of Borrower and on behalf of Lender, represent and certify that each is a duly authorized representative and has been fully empowered by proper resolution and/or the By-Laws of the respective parties to execute and deliver this Agreement, and that all necessary action for the execution of this Agreement has been duly taken.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

BMO HARRIS BANK, N.A.,                    410 CENTRE LLC
as successor-by-merger to
M&I MARSHALL & ILSLEY BANK

                                          By: _____
By: _____            John B. Urbahns, Sole Manager
     Jim D. Gray, Jr., Vice President

                                          _____
                                          John B. Urbahns, Guarantor

8

6617744_2 - 1/24/2012/11:31 AM/dsb

COBALT 000454

**TAB E**

## PRE-NEGOTIATION AGREEMENT

THIS PRE-NEGOTIATION AGREEMENT (this "Agreement"), dated October ____, 2013, is made and entered into by and among Wells Fargo Bank, National Association, by Hudson Americas, LLC, its attorney in fact ("Creditor"), the entities listed on Schedule 1 attached hereto and made a part hereof for all purposes (the "Borrower"), and the entities listed on Schedule 2 attached hereto and made a part hereof for all purposes (the "Guarantor") (the Borrower and the Guarantor are hereinafter collectively referred to as "Obligor").

### RECITALS

A.  Borrower borrowed money from BMO Harris Bank, N.A. as successor-by-merger to M&I Marshall & Ilsley Bank ("Original Lender"), Creditor's predecessor in interest, as evidenced by those certain promissory notes (as amended, modified, assumed and/or assigned from time to time, the "Loan") identified in Exhibit A attached hereto and made a party hereof for all purposes, and such documents evidencing or securing the Loan (collectively, the "Loan Documents").

B.  In connection with the Loan, the Obligor and Creditor desire to discuss certain issues between themselves. The parties have had meetings, discussions and negotiations and contemplate further meetings, discussions and possible negotiations between themselves or their agents or representatives regarding the Loan, and the facts and circumstances attendant thereto (all of which are collectively referred to as the "Discussions").

NOW, THEREFORE, the parties hereto agree as follows:

1.  Settlement Discussions: The Obligor and Creditor hereby agree that: (i) engagement after the date hereof in and/or discontinuation after the date hereof of any and all Discussions by any party hereto shall be at said party's sole and absolute discretion, it being the agreement and understanding of each party hereto that there shall be no breach or claim of breach hereof or liability hereunder associated with or arising out of a party's election, at any time or from time to time, for any reason or no reason, not to engage in Discussions or to limit or terminate then existing Discussions (as to topics one and all), and (ii) no representation, offer, concession or statement made by any party during the course of the Discussions shall constitute a waiver by any party of any rights, remedies, or defenses it may have, in any way modify or terminate any of the Loan Documents, in any way modify the legal relationship of the parties as set forth in the Loan Documents, or result in an admission against the interest of any party, except to the extent the parties otherwise agree in a duly executed and binding written agreement pursuant to Section 4 below. The parties further acknowledge that they have entered into this Agreement in order to facilitate Discussions, if any, in an open, frank and direct manner without risk of exposure to liability as a result thereof and in order to arrive at a resolution of the matters giving rise to the Discussions acceptable to the parties. Any and all Discussions shall be deemed to be discussions in the nature of settlement negotiations and shall be kept confidential and neither party nor any third party shall have the right to rely upon or to use the fact or content of any such Discussions (or the

1

Error! Unknown document property name.

/s/ by Borrower 10/2013

410 CENTRE-00248

PLAINTIFF EXHIBIT NO. 31

lack thereof) in connection with the exercise of any right, remedy or defense under the Loan Documents or in any action at law or in equity arising therefrom or otherwise arising from the relationship between the Obligor and Creditor, and no statement (oral or written) made by either party to the other in the course of the Discussions shall be deemed, in any proceeding at law or in equity involving the Loan Documents or the Loan described herein, (i) an admission of any fact; or (ii) evidence or probative of any act or omission to act, or intent of any party.

It is expressly understood that each party reserves all legal and equitable rights and remedies and that the parties do not intend to require the exclusion of any evidence otherwise discoverable as contemplated by Rule 408 of the Federal Rules of Civil Procedure or any similar state law.

2. No Waiver by Creditor. Creditor has not in any way waived any rights or remedies it may have to insist on full performance by the Obligor of all obligations under the Loan Documents or any rights or remedies available to it thereunder or otherwise available at law or in equity.

3. No Waiver by Obligor. Obligor has not in any way waived any rights or remedies it may have prior to and until the date of this Agreement with respect to the Loan or any of the Loan Documents, or otherwise available at law or in equity either directly in an action against Creditor, as a defense against any action by Creditor against Obligor or any other civil proceeding or otherwise.

4. Written Agreements. No statement made by either party in connection with any discussions or this Agreement shall be relied upon by the other until an agreement reflecting the same is reduced to a duly executed and binding written agreement, approved (in the case of Creditor, by its resolution committee and confirmed by senior management) and executed by all parties in their sole discretion, and the Loan Documents are modified, if necessary. No agreements, representations or warranties shall be binding or effective unless agreed to in writing by the Obligor and Creditor as evidenced by a duly executed and binding written agreement after the approval of Creditor's resolution committee and confirmation of its senior management have been obtained.

5. No Tolling. Discussions, if any, shall not operate (i) to relieve the Obligor of its obligations to comply in a full and timely manner with any and all obligations (monetary or non-monetary) set forth in the Loan Documents, or (ii) as a waiver by Creditor of its rights to demand full and timely performance of all obligations under the Loan Documents. Neither the execution of this Agreement nor the Creditor's participation (or election not to participate) in any Discussions shall operate to toll any time period which otherwise might be applicable to actions or undertakings by any party, including without limitation any time periods which may be provided for in the Loan Documents. Nothing contained in this Agreement is intended (i) to limit or otherwise affect Creditor's rights or Creditor's ability to initiate, continue or otherwise proceed to exercise any rights or remedies it may have before, during or after Discussions, if any, including, but not limited to, giving notices of default or initiating foreclosure proceedings; or (ii) to relieve the Obligor of any obligations it has under the Loan Documents.

2

410 CENTRE_00249

6. Authorized Representatives. The individuals who conduct the Discussions on Creditor's behalf do not have the authority to bind Creditor. If any of such individuals determine or conclude that it may be appropriate to agree with Obligor concerning any proposed waiver, modification, forbearance, amendment to or amendment of any of the Loan Documents or any modification of any of the obligations thereunder (each, a "Proposal"), they will present the Proposal to, and seek the approval of the Proposal by their resolution committee and if approved, the confirmation of such approval by their senior management. Only after Creditor's senior management confirms the approval of the Proposal and Creditor and Obligor enter into a duly executed and binding written agreement relating thereto will any Proposal be binding on Creditor.

7. Payment Statements. From time to time, Creditor (or its servicer) has sent and may send to the Obligor payment statements. The payment statements are generated for the Obligor's information and convenience only, and the billing statements do not waive, amend or alter the Obligor's obligations under the Loan Documents.

8. No Third Party Beneficiaries. The parties acknowledge that Discussions, if any, are entered into for the sole benefit of the parties hereto, and no other person or entity shall have any rights by reason of any Discussions (or lack thereof) or this Agreement. The parties further acknowledge that either party shall have the right to terminate the Discussions at any time, with or without cause, without notice to the other party.

9. Amendments in Writing. No amendment of or supplement to this Agreement shall be valid or effective unless made in writing and executed by all parties hereto.

10. Counterparts and Electronic Signatures. This Agreement may be executed in multiple counterparts, each of which shall constitute an original hereof, and all of which taken together shall constitute one and the same agreement. Further, this Agreement may be executed by facsimile or by portable document format (.pdf) signature, such that execution of this Agreement by facsimile or by portable document format (.pdf) signature shall be deemed effective for all purposes as though this Agreement was executed as a "blue ink" original.

11. Counsel. The Obligor and Creditor acknowledge that each party has engaged separate legal counsel to represent their interests in connection with the Discussions and the negotiation and execution of this Agreement.

[SIGNATURE PAGE FOLLOWS]

3

Error! Unknown document property name.

410 CENTRE-00250

IN WITNESS WHEREOF, **the** parties have executed this Agreement to be effective as of the day and year first set forth above.

CREDITOR:

**WELLS FARGO BANK,**
**NATIONAL ASSOCIATION**
By:     Hudson Americas LLC, its attorney-in-fact

By:     _____
        Marisa K. McGaughey,
        Assistant Vice President

BORROWER:

**410 CENTRE LLC,** an Indiana limited liability company

By: _____

Name: _____

Title: _____

GUARANTOR:

_____
JOHN B. URBAHNS, an adult individual

Error! Unknown document property name.

## EXHIBIT A

### The Loan

Loan Transactions evidenced by the following documents:

1. Promissory Note (as amended, assigned and/or assumed from time to time, the "Note"), dated June 13, 2008 (the "Closing Date"), executed and delivered by Borrower, payable to the order of Original Lender, in the original principal amount of $5,100,000.00;

2. that certain Loan Agreement by and between Borrower and Original Lender, dated as of the Closing Date;

3. the liens, security interests, terms and provisions of that certain Deed of Trust Security Agreement and Assignment of Leases and Fixture Filing, dated as of the Closing Date, executed and delivered by Borrower to Scott K. McDonald, as trustee for the benefit of Original Lender, recorded as Instrument No. 20080125701, Book 13542, Page 407, in the Real Property Records of Bexar County, Texas;

4. the liens, security interests, terms and provisions of that certain Assignment of Leases and Rents dated as of the Closing Date, executed and delivered by Borrower for the benefit of Original Lender, recorded as Instrument No. 20080125702, Book 13542, Page 445, in the Real Property Records of Bexar County, Texas;

5. Continuing Guaranty dated as of the Closing Date, executed and delivered by Guarantor;

6. Assignment of Construction Contracts dated as of the Closing Date, executed and delivered by Borrower in favor of Original Lender;

7. Environmental Certificate and Indemnity Agreement by Borrower and Guarantor in favor of Original Lender;

8. Forbearance Agreement dated effective September 30, 2011, by and between Borrower, Guarantor and Original Lender; and

9. various UCC-1 Financing Statements.

Error! Unknown document property name.

5

**410 CENTRE-00252**

## SCHEDULE I

### Borrower

410 Centre LLC

Error! Unknown document property name.

410 CENTRE_00253

## SCHEDULE 2

### Guarantor

John B. Urbahns

Error! Unknown document property name.

410 CENTRE-00254

## PRE-NEGOTIATION AGREEMENT

THIS PRE-NEGOTIATION AGREEMENT (this "Agreement"), dated    October $30$ , 2013, is made and entered into by and among Wells Fargo Bank, National Association, by Hudson Americas, LLC, its attorney in fact ("Creditor"), the entities listed on Schedule 1 attached hereto and made a part hereof for all purposes (the "Borrower"), and the entities listed on Schedule 2 attached hereto and made a part hereof for all purposes (the "Guarantor") (the Borrower and the Guarantor are hereinafter collectively referred to as "Obligor").

## RECITALS

A.    Borrower borrowed money from BMO Harris Bank, N.A. as successor-by-merger to M&I Marshall & Ilsley Bank  ("Original Lender"), Creditor's predecessor in interest, as evidenced by those certain promissory notes (as amended, modified, assumed and/or assigned from time to time, the "Loan") identified in Exhibit A attached hereto and made a party hereof for all purposes, and such documents evidencing or securing the Loan (collectively, the "Loan Documents").

B.    In connection with the Loan, the Obligor and Creditor desire to discuss certain issues between themselves.  The parties have had meetings, discussions and negotiations and  contemplate further meetings, discussions and possible negotiations between themselves or their agents or representatives regarding the Loan, and the facts and circumstances attendant thereto (all of which are collectively referred to as the "Discussions").

NOW, THEREFORE, the parties hereto agree as follows:

1.    Settlement Discussions:  The Obligor and Creditor hereby agree that: (i) engagement after the date hereof in and/or discontinuation after the date hereof of any and all Discussions by any party hereto shall be at said party's sole and absolute discretion, it being the agreement and understanding of each party hereto that there shall be no breach or claim of breach hereof or liability hereunder associated with or arising out of a party's election, at any time or from time to time, for any reason or no reason, not to engage in Discussions or to limit or terminate then existing Discussions (as to topics one and all), and (ii) no representation, offer, concession or statement made by any party during the course of the Discussions shall constitute a waiver by any party of any rights, remedies, or defenses it may have, in any way modify or terminate any of the Loan Documents, in any way modify the legal relationship of the parties as set forth in the Loan Documents, or result in an admission against the interest of any party, except to the extent the parties otherwise agree in a duly executed and binding written agreement pursuant to Section 4 below.  The parties further acknowledge that they have entered into this Agreement in order to facilitate Discussions, if any, in an open, frank and direct manner without risk of exposure to liability as a result thereof and in order to arrive at a resolution of the matters giving rise to the Discussions acceptable to the parties.  Any and all Discussions shall be deemed to be discussions in the nature of settlement negotiations and shall be kept confidential and neither party nor any third party shall have the right to rely upon or to use the fact or content of any such Discussions (or the

1

Error! Unknown document property name.

lack thereof) in connection with the exercise of any right, remedy or defense under the Loan Documents or in any action at law or in equity arising therefrom or otherwise arising from the relationship between the Obligor and Creditor, and no statement (oral or written) made by either party to the other in the course of the Discussions shall be deemed, in any proceeding at law or in equity involving the Loan Documents or the Loan described herein, (i) an admission of any fact; or (ii) evidence or probative of any act or omission to act, or intent of any party.

It is expressly understood that each party reserves all legal and equitable rights and remedies and that the parties do not intend to require the exclusion of any evidence otherwise discoverable as contemplated by Rule 408 of the Federal Rules of Civil Procedure or any similar state law.

2.  No Waiver by Creditor.  Creditor has not in any way waived any rights or remedies it may have to insist on full performance by the Obligor of all obligations under the Loan Documents or any rights or remedies available to it thereunder or otherwise available at law or in equity.

3.  No Waiver by Obligor.  Obligor has not in any way waived any rights or remedies it may have prior to and until the date of this Agreement with respect to the Loan or any of the Loan Documents, or otherwise available at law or in equity either directly in an action against Creditor, as a defense against any action by Creditor against Obligor or any other civil proceeding or otherwise.

4.  Written Agreements.  No statement made by either party in connection with any discussions or this Agreement shall be relied upon by the other until an agreement reflecting the same is reduced to a duly executed and binding written agreement, approved (in the case of Creditor, by its resolution committee and confirmed by senior management) and executed by all parties in their sole discretion, and the Loan Documents are modified, if necessary. No agreements, representations or warranties shall be binding or effective unless agreed to in writing by the Obligor and Creditor as evidenced by a duly executed and binding written agreement after the approval of Creditor's resolution committee and confirmation of its senior management have been obtained.

5.  No Tolling.  Discussions, if any, shall not operate (i) to relieve the Obligor of its obligations to comply in a full and timely manner with any and all obligations (monetary or non-monetary) set forth in the Loan Documents, or (ii) as a waiver by Creditor of its rights to demand full and timely performance of all obligations under the Loan Documents. Neither the execution of this Agreement nor the Creditor's participation (or election not to participate) in any Discussions shall operate to toll any time period which otherwise might be applicable to actions or undertakings by any party, including without limitation any time periods which may be provided for in the Loan Documents. Nothing contained in this Agreement is intended (i) to limit or otherwise affect Creditor's rights or Creditor's ability to initiate, continue or otherwise proceed to exercise any rights or remedies it may have before, during or after Discussions, if any, including, but not limited to, giving notices of default or initiating foreclosure proceedings; or (ii) to relieve the Obligor of any obligations it has under the Loan Documents.

2

Error! Unknown document property name.

410 CENTRE-00256

6.    Authorized Representatives.  The individuals who conduct the Discussions on Creditor's behalf do not have the authority to bind Creditor.  If any of such individuals determine or conclude that it may be appropriate to agree with Obligor concerning any proposed waiver, modification, forbearance, amendment to or amendment of any of the Loan Documents or any modification of any of the obligations thereunder (each, a "Proposal"), they will present the Proposal to, and seek the approval of the Proposal by their resolution committee and if approved, the confirmation of such approval by their senior management.  Only after Creditor's senior management confirms the approval of the Proposal and Creditor and Obligor enter into a duly executed and binding written agreement relating thereto will any Proposal be binding on Creditor.

7.    Payment Statements.  From time to time, Creditor (or its servicer) has sent and may send to the Obligor payment statements.  The payment statements are generated for the Obligor's information and convenience only, and the billing statements do not waive, amend or alter the Obligor's obligations under the Loan Documents.

8.    No Third Party Beneficiaries.  The parties acknowledge that Discussions, if any, are entered into for the sole benefit of the parties hereto, and no other person or entity shall have any rights by reason of any Discussions (or lack thereof) or this Agreement.  The parties further acknowledge that either party shall have the right to terminate the Discussions at any time, with or without cause, without notice to the other party.

9.    Amendments in Writing.  No amendment of or supplement to this Agreement shall be valid or effective unless made in writing and executed by all parties hereto.

10.    Counterparts and Electronic Signatures.  This Agreement may be executed in multiple counterparts, each of which shall constitute an original hereof, and all of which taken together shall constitute one and the same agreement. Further, this Agreement may be executed by facsimile or by portable document format (.pdf) signature, such that execution of this Agreement by facsimile or by portable document format (.pdf) signature shall be deemed effective for all purposes as though this Agreement was executed as a "blue ink" original.

11.    Counsel.  The Obligor and Creditor acknowledge that each party has engaged separate legal counsel to represent their interests in connection with the Discussions and the negotiation and execution of this Agreement.

[SIGNATURE PAGE FOLLOWS]

Error! Unknown document property name.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the day and year first set forth above.

CREDITOR:

**WELLS FARGO BANK,**
**NATIONAL ASSOCIATION**
By:     Hudson Americas LLC, its attorney-in-fact

By:     _Marisa K. McGaughey_
        Marisa K. McGaughey,
        Assistant Vice President

BORROWER:

**410 CENTRE LLC,** an Indiana limited liability company

By:_____

Name:_____

Title:_____

GUARANTOR:

_____
**JOHN B. URBAHNS,** an adult individual

4

**410 CENTRE-00258**

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the day and year first set forth above.

CREDITOR:

WELLS FARGO BANK,
NATIONAL ASSOCIATION
By: Hudson Americas LLC, its attorney-in-fact

By: _____
Marisa K. McGaughey,
Assistant Vice President

BORROWER:

410 CENTRE LLC, an Indiana limited liability company

By: _____
Name: _____
Title: _____

GUARANTOR:

_____
JOHN B. URBAHNS, an adult individual

Error! Unknown document property name.

410 CENTRE_00259

## EXHIBIT A

### The Loan

Loan Transactions evidenced by the following documents:

1. Promissory Note (as amended, assigned and/or assumed from time to time, the "Note"), dated June 13, 2008 (the "Closing Date"), executed and delivered by Borrower, payable to the order of Original Lender, in the original principal amount of $5,100,000.00;

2. that certain Loan Agreement by and between Borrower and Original Lender, dated as of the Closing Date;

3. the liens, security interests, terms and provisions of that certain Deed of Trust Security Agreement and Assignment of Leases and Fixture Filing, dated as of the Closing Date, executed and delivered by Borrower to Scott K. McDonald, as trustee for the benefit of Original Lender, recorded as Instrument No. 20080125701, Book 13542, Page 407, in the Real Property Records of Bexar County, Texas;

4. the liens, security interests, terms and provisions of that certain Assignment of Leases and Rents dated as of the Closing Date, executed and delivered by Borrower for the benefit of Original Lender, recorded as Instrument No. 20080125702, Book 13542, Page 445, in the Real Property Records of Bexar County, Texas;

5. Continuing Guaranty dated as of the Closing Date, executed and delivered by Guarantor;

6. Assignment of Construction Contracts dated as of the Closing Date, executed and delivered by Borrower in favor of Original Lender;

7. Environmental Certificate and Indemnity Agreement by Borrower and Guarantor in favor of Original Lender;

8. Forbearance Agreement dated effective September 30, 2011, by and between Borrower, Guarantor and Original Lender; and

9. various UCC-1 Financing Statements.

5

Error! Unknown document property name.

**410 CENTRE-00260**

## SCHEDULE I

### Borrower

410 Centre LLC

Error! Unknown document property name.

410 CENTRE-00261

## SCHEDULE 2

**Guarantor**

John B. Urbahns

Error! Unknown document property name.

**410 CENTRE-00262**